# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

# MIAMI DIVISION

| | |
|---|---|
| L.H., | Case No.: |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| | **Trafficking Victims Protection** |
| MARRIOTT INTERNATIONAL, INC.; | **Reauthorization Act** |
| HILTON WORLDWIDE HOLDINGS INC.; | **(18 U.S.C. § 1595)** |
| G6 HOSPITALITY, LLC; SIX CONTINENTS | |
| HOTELS, INC.; HOLIDAY HOSPITALITY | **DEMAND FOR JURY TRIAL** |
| FRANCHISING, LLC; AND CRAIGSLIST, | |
| INC. | |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff L.H., by and through the undersigned counsel, hereby respectfully submits her complaint for damages and makes the following averments:

## <u>INTRODUCTION</u>

1.      Human sex trafficking is a form of modern-day slavery that exists illegally throughout the United States and globally and is furthered by public lodging establishments.

2.      For years, sex trafficking ventures have brazenly operated both online, and in and out of hotels and motels throughout this country.  Criminals parade their misconduct openly on hotel and motel properties while the owners and hospitality industry neglect the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

3.      The prevalence of this crime at hotels and motels is due to many factors, including but not limited to, ease of access for buyers, the ability to pay in cash (non-traceability), the ability to

1

maintain anonymity, privacy, discretion, and permission.

4.      All Defendants, including Craigslist, Inc. (hereinafter "Craigslist"); Marriott International, Inc. (hereinafter "Marriott"); G6 Hospitality, LLC (hereinafter "G6"); Six Continents Hotels, Inc. (hereinafter "SCH" or "Six Continents"); Holiday Hospitality Franchising, LLC (hereinafter "HHF" or "Holiday Hospitality"); and Hilton Worldwide Holdings Inc. (hereinafter "Hilton") (collectively, Marriott, G6, SCH, HHF, and Hilton may be referred to as "Defendant Hotels"), knew and have known for more than a decade that sex trafficking repeatedly occurs under their flag and on their platforms throughout the country.   Rather than taking timely and effective measures to thwart this epidemic, Defendant Hotels have chosen to ignore the open and obvious presence of sex trafficking on their properties, benefitting from the profit created by rooms rented for this explicit and apparent purpose. Instead of ending its facilitation of child sex trafficking, Defendant Craigslist created a façade of support by making changes to specific sections of its website, including changing the name of its "erotic services" section to "adult services" and charging extra fees for ads in these categories.

5.      Plaintiff L.H., a survivor of sex trafficking, brings this action for damages under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

6.      L.H., a vulnerable child, was trafficked for commercial sex at the age of approximately fifteen years old in Florida and across the United States. L.H.'s first trafficker deceived her by pretending to be a potential romantic partner and promising her a better life.  He convinced L.H. to run away from her abusive home and then brutally forced her into sexual servitude. After L.H.'s first trafficker was arrested and convicted for trafficking in 2012, when L.H. was only 18, his friend took over and continued trafficking L.H. using the same methods. L.H.'s traffickers would

routinely drug her and keep her drugged to control her while they advertised her on Craigslist and sold her to buyers at Defendant Hotels' properties. Defendant Hotels permitted and engaged in the selling of L.H. via commercial sex transactions at their hotel properties through force, fraud, and coercion as they profited. L.H. endured brutal physical assaults, psychological torment, and verbal abuse at Defendant Hotels' properties as Defendant Craigslist and its corporate agents benefited from the assistance of each arrangement.

7.      L.H.'s traffickers used common methods of coercion, including but not limited to, maintaining complete control over her person and whereabouts as well as social media, email, and phone accounts, alcohol, drugs, hitting, slapping, choking, beatings, manipulation, humiliation, degradation, exhaustion, isolation, incurrence of debt, threats to her person and to her family members, and other methods to force compliance.

8.      Adult traffickers took nude or partially nude photographs of Plaintiff L.H. as a minor and as an adult and used them for advertisements in the "erotic services" and the "personal ads" sections of Craigslist to advertise commercial sex with Plaintiff to take place in multiple hotel and motel rooms in specific geographical locations. Utilizing Craigslist's internal messaging system, Plaintiff's traffickers and commercial sex buyers arranged the venue for which such sex acts would take place. Plaintiff was repeatedly and frequently brought and held to be purchased by buyers at locations including but not limited to, Marriott Stanton Hotel, Hilton Bentley Hotel, Hilton Miami Downtown, Hilton Garden Inn Miami South Beach, Embassy Suites by Hilton Miami International Airport, Motel 6 Miami Beach, and the Holiday Inn Miami North I-95.

9.      During the life of an advertisement on Craigslist, multiple buyers would respond to request meeting locations with Plaintiff L.H. via Craigslist's internal communication system.

10.     Defendant Craigslist provided an electronic means for facilitating and arranging the

assault, exploitation, and sex trafficking of L.H. at multiple locations, including, but not limited to the Defendant Hotels' properties. A continuing daily parade of buyers would arrive at the Defendant Hotels' locations and enter into rooms they either did not rent, or did not rent for the purpose of an overnight stay. One by one, dozens to hundreds of unrelated buyers used Defendant Hotels' rooms and services to sexually exploit, rape, sexually abuse, and physically assault the Plaintiff L.H.

11.     Repeated acts took place with the actual and/or constructive knowledge of all Defendants who turned a blind eye to sex trafficking; failed to take concrete and effective steps to prevent, spot, or report trafficking; and otherwise systematically created ways to use trafficking victims as a means to increase profits.

12.     As a direct and proximate result of Defendant Hotels' collective failure to act, mandate, establish, execute, and/or modify anti-trafficking efforts on their hotel brand properties, L.H. was trafficked for the purpose of commercial sex, sexually exploited, and victimized repeatedly at Marriott, Hilton, IHG, and G6 branded hotels.

13.     L.H. now brings this action for damages against Defendants.  Each Defendant Hotel and Craigslist, in violation of 18 U.S.C. § 1595, knowingly enabled, harbored, held, facilitated, or otherwise benefitted from participation in a venture that it knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

## **PARTIES**

14.     Plaintiff L.H. is a citizen of the United States of America and a resident of the State of Florida.

a.     L.H. was approximately fifteen years old when she was first sold for sex in Miami, Florida.  L.H. is a "victim" survivor of "a severe form of sex trafficking" pursuant

to 18 U.S.C. §§ 1591(a), 1595(a), and as it is defined under 22 U.S.C. § 7102(11), (16).

b.  Due to the sensitive and private nature of L.H.'s allegations in this case, L.H. requests this Court permit her to proceed under a pseudonym and files a Motion for Protective Order pursuant to Federal Rule of Civil Procedure 26(c) herewith to ensure Defendants keep her identity confidential throughout the pendency of the lawsuit and thereafter.[1]

c.  The Federal Rules of Civil Procedure require pleadings to state the name of all parties.[2]   However, there are judicially recognized exceptions when the issues involved are of a sensitive and highly personal nature.[3]   For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment,

---

[1] Courts typically issue a protective order and allow a party to proceed under pseudonym when the party's privacy interests outweigh the general presumption of open judicial proceedings and possible prejudice to the opposing party.  *See Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004); *Does I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068–69 (9th Cir. 2000) (reviewing cases and joining the 4th, 5th, 10th, and 11th Circuits in holding that a party may preserve their anonymity "when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity").

[2] Fed. R. Civ. P. 10(a).

[3] In balancing the need to proceed anonymously, Courts must use "informed discretion" and consider all relevant factors.  *James v. Jacobson*, 6 F.3d 233, 242 (4th Cir. 1993).  Courts therefore routinely find that preserving the plaintiff's privacy interests substantially outweighs the public's interest and risk of unfairness to the defendant where there are "sensitive and highly personal" issues and where "identification poses a risk of retaliatory physical or mental harm to the requesting party."  *Id.* at 238; *see Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992) (same); *Doe v. Porter*, 370 F.3d at 560 (considering "whether prosecution of the suit will compel the plaintiffs to disclose information 'of the utmost intimacy'" (citing *Doe v. Stegall*, 653 F.2d 180, 185–86 (5th Cir.1981))); *Doe v. I.N.S., U.S. Dep't of Just.*, 867 F.2d 285, 286 n.1 (6th Cir. 1989) (permitting anonymity "to protect the petitioner's family…from possible reprisals"); *Lindsey v. Dayton-Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir. 1979) (recognizing the need for anonymity in "important privacy interest[s]" such as abortion, birth control, and child welfare cases).

oppression, or undue burden or expense.[4]

d.  Here, pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of highly personal and stigmatizing sexual information, including rape.[5]  L.H. fears stigma from her family, friends, potential employers, and community, if her true identity is revealed in the public record. Further, L.H. fears for her safety and well-being if her name is not sealed and her trafficker can find her.

e.  Moreover, Defendants will not be prejudiced.  L.H. will agree to reveal her identity to Defendants for the limited purpose of investigating L.H.'s claims once the parties have entered into a protective order.  L.H. simply seeks redaction of L.H.'s personally identifying information from the public docket and assurances that Defendants will not use or publish L.H.'s identity in a manner that will compromise her personal life or future employment prospects.

f.  L.H. should not be compelled to disclose her identity in order to maintain her

---

[4] Fed. R. Civ. P. 26(c).

[5] *See, e.g.*, *Doe v. Blue Cross & Blue Shield United of Wis.,* 112 F.3d 869, 872 (7th Cir.1997) ("[F]ictitious names are allowed when necessary to protect the privacy of…rape victims, and other particularly vulnerable parties or witnesses."); *Doe 1 v. George Washington Univ.*, 369 F. Supp. 3d 49, 64 (D.D.C. 2019) ("…courts generally allow a plaintiff to litigate under a pseudonym in cases containing allegations of sexual assault on the basis that they concern highly sensitive and personal subjects"); *Doe v. Blue Cross & Blue Shield of Rhode Island*, 794 F. Supp. 72, 74 (D.R.I. 1992) ("The plaintiff in this case does have a substantial privacy interest at stake. Unquestionably, one's sexual practices are among the most intimate parts of one's life.  When those sexual practices fall outside the realm of 'conventional' practices which are generally accepted without controversy, ridicule or derision, that interest is enhanced exponentially."); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 945 (D. Or. 2020) (granting the plaintiff-victim of sex trafficking's request for protective order and to proceed pseudonymously due to the sensitive nature of the issues); *Doe v. Alger*, 317 F.R.D. 37, 40 (W.D. Va. 2016) (finding "sexual misconduct" is a sufficient specific, sensitive, and personal privacy interest to warrant proceeding in anonymity).

privacy and safety.  L.H.'s privacy interest substantially outweighs the customary practice of judicial openness and there is no prejudice to Defendants.

15.    Defendant Marriott International, Inc. ("Marriott") is one of the largest hotel franchising companies in the world with over 7,000 branded properties across 131 countries.[6]  Marriott offers public lodging services directly and through its affiliates, subsidiaries, and franchises.  In 2019, Marriott claimed to have "successfully trained 500,000 hotel workers to spot the signs of human trafficking in its hotels and how to respond if they do."[7]

   a.   Defendant Marriott is a Delaware corporation with its principal place of business located at 10400 Fernwood Road, Dept. 324.13, Bethesda, Maryland 20817.  It can be served by its registered agent CT Corporation System at 1200 South Pine Island Road Plantation, Florida 33324.

   b.   Marriott is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the predecessor.

   c.   As of 2016, Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott.

   d.   Marriott owns, supervises, manages, controls, and/or operates the Marriott Stanton on South Beach ("Marriott Stanton Hotel") located at 161 Ocean Drive, Miami Beach, Florida 33139 where L.H. was trafficked.

   e.   Marriott is the principal in an agency relationship with the Marriott Stanton Hotel.

---

[6] We Are Marriott International, *A Brand Leader*, https://www.marriott.com/marriott/aboutmarriott.mi (last visited Jul. 23, 2021).
[7] News Center, *Marriott International Has Trained 500,000 Hotel Workers to Recognize the Signs of Human Trafficking Wyndham Hotels & Resorts Reinforces Efforts to Combat Human Trafficking*, (Jan. 22, 2020) https://corporate.wyndhamhotels.com/news-releases/wyndham-hotels-resorts-reinforces-efforts-to-combat-human-trafficking/.

In addition to Marriott's liability under TVPRA section 1595, Marriott is vicariously liable for the acts and/or omissions of the staff at its Marriott Stanton Hotel and all of its franchisee hotels.

f.  The Marriott Stanton Hotel where L.H. was trafficked has apparent agency for Marriott so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

g.  Marriott has ratified the actions and inactions of the Marriott Stanton Hotel.

h.  Marriott exercises day-to-day control over the Marriott Stanton Hotel through its brand standards and retains control over the Marriott Stanton Hotel under the terms of its franchise agreement.

i.  As the principal and as a hotel operator, Marriott controls the training and policies for its brand hotels, including the Marriott Stanton Hotel where L.H. was trafficked. Marriott represents that it considers guest safety and security important and requires the brand hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[8]

j.  Upon information and belief, Marriott also controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by

---

[8] *See Marriott Int'l Inc. Human Rights Policy Statement* (July 2017), https://www.marriott.com/marriottassets/Multimedia/PDF/Corporate/HumanRightsStatement.pdf .

Marriott, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Marriott Stanton Hotel where L.H. was trafficked.

k.  Through Marriott's relationship with the staff at the Marriott Stanton Hotel where L.H. was trafficked and where L.H.'s traffickers were guests or visitors, Marriott knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through royalty payments, licensing fees, and percentages of the gross room revenue which Marriott is entitled to under the franchise agreements.

l.  Marriott benefits financially by receiving a percentage of the gross room revenue from the money generated by the operations of its hotels, including through a percentage of the revenue generated at the Marriott Stanton Hotel from the rates charged on the rooms in which L.H. was trafficked for sex.

m.  Marriott regularly conducts business in the State of Florida, derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Marriott Stanton Hotel, has caused indivisible injuries to L.H. in Florida, and profited from an illegal sex trafficking venture at the Marriott Stanton Hotel.

16.   Defendant Hilton Worldwide Holdings Inc. ("Hilton") is "one of the world's largest, fastest-growing hospitality companies" with over 6,500 branded properties across 119 countries.[9]

---

[9] Welcome to Hilton, https://www.hilton.com/en/corporate/ (last visited July 23, 2021).

Hilton offers public lodging services directly and through its affiliates, subsidiaries, and franchises. Hilton "signed the ECPAT ["End Child Prostitution and Trafficking"] Code to combat sexual exploitation in the travel industry in 2011" and claims to "have been providing training on human trafficking risks to all our hotels ever since."[10]

    a.   Defendant Hilton is a Delaware corporation with its principal place of business located at 1775 Tysons Boulevard, 7th Floor, Tysons, Virginia 22102. It can be served by its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee, Florida 32301.

    b.   Hilton owns, supervises, manages, controls, and/or operates the Hilton Bentley Miami-South Beach ("Hilton Bentley Hotel") located at 101 Ocean Drive, Miami Beach, Florida 33139 where L.H. was trafficked.

    c.   Hilton is the principal in an agency relationship with the Hilton Bentley Hotel. In addition to Hilton's liability under TVPRA section 1595, Hilton is vicariously liable for the acts and/or omissions of the staff at its Hilton Bentley Hotel and all of its franchisee hotels.

    d.   The Hilton Bentley Hotel where L.H. was trafficked has apparent agency for Hilton so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

---

[10] *Hilton Slavery and Human Trafficking Statement*, Training and Awareness, 5 (FY 2020), https://cr.hilton.com/wp-content/uploads/2021/06/Hilton-Slavery-and-Trafficking-Statement-2020.pdf. Such training has occurred both in the State of Florida and around major events. *See id.* ("Our safety and security teams and outside partners routinely train hotel Team Members in person on identifying and combatting human trafficking on a risk basis. For example, at the occasion of the Super Bowl in Tampa, Florida, in January 2020, we partnered with the NGO It's a Penalty to increase awareness with Team Members, guests and other participants about signs of human trafficking and how to report it across all hotels (managed and franchised) in greater Tampa.")

e.  Hilton has ratified the actions and inactions of the Hilton Bentley Hotel.

f.  Hilton exercises day-to-day control over the Hilton Bentley Hotel through its brand standards and retains control over the Hilton Bentley Hotel under the terms of its franchise agreement.

g.  As the principal and as a hotel operator, Hilton controls the training and policies for its brand hotels, including the Hilton Bentley Hotel where L.H. was trafficked. Hilton represents that it considers guest safety and security important and requires the brand hotels in its portfolio to comply with Hilton brand standards and all local, state, and federal laws.

h.  Upon information and belief, Hilton also controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Hilton, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Hilton Bentley Hotel where L.H. was trafficked.

i.  Through Hilton's relationship with the staff at the Hilton Bentley Hotel where L.H. was trafficked and where L.H.'s traffickers were guests or visitors, Hilton knowingly benefited, or received something of value, from its participation in a

11

venture which it knew or should have known to engage in sex trafficking through royalty payments, licensing fees, and percentages of the gross room revenue which Marriott is entitled to under the franchise agreements.

j.   Hilton benefits financially by receiving a percentage of the gross room revenue from the money generated by the operations of its hotels, including through a percentage of the revenue generated at the Hilton Bentley Hotel from the rates charged on the rooms in which L.H. was trafficked for sex.

k.   Hilton regularly conducts business in the State of Florida, derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Hilton Bentley Hotel, has caused indivisible injuries to L.H. in Florida, and profited from an illegal sex trafficking venture at the Hilton Bentley Hotel.

17.     Defendants G6 Hospitality, LLC ("G6") is one of the largest motel brands in the world. It is a Delaware limited liability company. G6 may be served with service of process by serving its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

a.   Motel 6 South ("Motel 6®") is a G6 brand property.

b.   The Motel 6 brand operates in forty-nine (49) states. The brand's assets are strategically located throughout the United States – close to airports, freeways, and other thoroughfares. In 2015, G6 was rated among the top ten (10) hospitality companies.

c.   As an integrated enterprise and/or joint employer, Defendant G6 and the Motel 6® are separately and jointly responsible for compliance with all applicable laws.

d. As an integrated enterprise and/or joint employer, Defendant G6 and the Motel 6®️ are jointly and severally liable for any damages caused by their employees.

e. Upon information and belief, Defendant G6 controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by G6, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Motel 6 hotel where L.H. was trafficked.

f. Through its relationship with the staff at the Motel 6®️ where L.H. was trafficked and the perpetrator who trafficked L.H. at Motel 6®️ hotels, Defendant G6 knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

g. G6 benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was trafficked for sex.

h. G6 owns, supervises, and/or operates the Motel 6®️ located at 7330 NW 36th Street, Miami, Florida 33166.

18. Defendants Six Continents Hotels, Inc. ("SCH" or "Six Continents") and Holiday Hospitality Franchising, LLC ("HHF" or "Holiday Hospitality") (collectively may be referred to

as "IHG") are Delaware corporations that jointly own, operate, design, and control the InterContinental Hotels Group ("IHG") brand in the United States.

    a.   Defendant Six Continents is the ultimate parent company for IHG in the United States. Defendant Six Continents is responsible for all brand standards for IHG brand hotels in the United States. Defendant Six Continents also owns, operates, or otherwise manages the software program for making reservations at IHG brand hotels. Defendant Six Continents may be served with service of process by serving its registered agent, The Corporation Trust Company Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

    b.   Defendant Holiday Hospitality Franchising, LLC ("Holiday Hospitality") is a wholly owned subsidiary of IHG. It is a Delaware corporation and can be served by its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

    c.   The Holiday Inn is an IHG hotel.

    d.   As a hotel brand manager, IHG controls the training and policies for its branded properties, including the Holiday Inn where L.H. was trafficked. IHG represents that it considers guest safety and security important and requires the hotel brands in its portfolio to comply with IHG brand standards and all local, state, and federal laws.

    e.   Through its relationship with the staff at the Holiday Inn where L.H. was trafficked and the perpetrator who trafficked L.H. at the Holiday Inn hotel, IHG knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in ex trafficking.

    f.   IHG receives a percentage of the gross room revenue from the money generated by the operations of Holiday Inn hotels, including a percentage of the revenue generated for the rate charged on the hotel guest rooms in which the Plaintiff was trafficked for sex.

    g.   IHG did not train the staff of its Holiday Inn brand hotels on the warning signs of human trafficking; did not adopt or implement policies and procedures to prevent human trafficking at its Holiday Inn brand hotels; did not adopt or implement security or cybersecurity policies and procedures to prevent human trafficking at hits Holiday Inn hotels; did not establish brand standards for its Holiday Inn hotels with respect to the prevention of human trafficking; and did not audit or otherwise monitor its Holiday Inn brand hotels on their efforts to prevent human trafficking.

    h.   IHG owns, supervises, and/or operates the Holiday Inn® located at 7927 NW 7th Ave, Miami, FL 33150.

19.    Defendant Craigslist, Inc. ("Craigslist") is a Delaware corporation that owns, operates, designs, and controls the Craigslist website at www.craigslist.org. At all times hereto, Defendant transacted business in Miami-Dade County, Florida, and purposefully availed itself to Miami-Dade County, Florida, and the citizens of Florida, through Craigslist.

20.    Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

21.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action was brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

23.     The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

24.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."  This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

25.     Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can then be divided into the remaining two elements: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the

*means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. § 1589.

26.     Thus, while the complete definition of "sex trafficking" is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75 percent of survivors in the Polaris survey reported coming into contact with hotels at some point during their trafficking…However, despite how many victims are crossing paths with hotels, 94 percent [also] disclosed they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project[11]*

27.     Human trafficking is the world's fastest growing crime.[12]   While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[13]

28.     Sex traffickers, or "pimps," use threats, violence, manipulation, lies, debt bondage, and

---

[11] Brittany Anthony, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking,* Hotels and Motels, POLARIS 16-23 (Jul. 2018) https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf; *see also Hotels & Motels Recommendations*, POLARIS https://polarisproject.org/hotels-motels-recommendations (last visited July 23, 2021).
[12] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[13] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

29.     The hospitality industry plays a crucial role in the sex trade.[14]  The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

30.     According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[15]  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

31.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call."

32.     Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e., those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[16]

---

[14] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[15] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

[16] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

33.     The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[17]

34.     Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[18]   Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

35.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.[19]

36.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry… and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[20]

37.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a

---

[17] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[18] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

[19] Combating Human Trafficking in the Hotel Industry, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).

[20] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[21]

38.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

39.     There are many signs of sex trafficking. Though some are discreet by nature, under attentive and well-trained hotel operators, such signs would prompt action or would have been prevented in the first place under proper policies and procedures. These signs include, but are certainly not limited to: paying with cash, an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining in-room service for several consecutive days, ordering additional towels and sheets at varying times, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, or men who rent rooms for someone else, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification

---

[21] DEPARTMENT OF HOMELAND SECURITY, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

documents.[22]

40.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[23]   Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

41.     In 2010, Hilton Hotels publicized that it was beginning training of some of its employees to look for signs of trafficking.[24]

42.     Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[25]

43.     The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

44.     At the General Assembly of the United Nations ("UN") convened in New York, New York in November 2000, the Palermo Protocol to prevent, suppress, and punish trafficking in persons was adopted.[26]

---

[22] *Id*. *See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[23] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[24] Katie Lobosco, Super 8 workers trained to spot sex trafficking, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[25] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[26] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing
the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.

45.     In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[27]

46.     The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

47.     ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including but not limited to:[28]

    a.   Develop a formal policy against trafficking;

    b.   Develop a protocol for response;

    c.   Conduct periodic training on indicators;

    d.   Not renting by the hour;

    e.   Not permitting cash payments;

    f.   Blocking "internet access to popular websites for online sex ads,"

    g.   Monitoring "online sex ads such as Craigslist and Backpage for your hotel name

---

[27] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacany_Report.pdf.
[28] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, available at https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf.

and pictures of your rooms and guests";

  h.  Change wi-fi passwords in rooms and cafes regularly;

  i.  Require all visitors are logged, including guest name, visitor name, arrival time, departure time, and room number;

  j.  Actively greet and speak with all visitors arriving at night;

  k.  Watch for a trend of visitors to the same room; and

  l.  Be aware of rooms with excess condoms, lubricants, and towels and report these indicators to management.

48.  In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[29]

49.  During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[30]

50.  Statistics released in 2014 by the International Labor Organization ("ILO") showed that

---

[29] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[30] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[31]  Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[32]

51.     A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[33]  This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[34]

52.     In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[35]

53.     The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[36]  In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the

---

[31] International Labour Office, Profits and Poverty: The Economics of Forced Labour (2014), at 13,
https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[32] Id. at 15.
[33] Sarkisian, supra n.14, at 4.
[34] Id. at 5.
[35] U.S. Dep't of State, 2016 Trafficking in Persons Report (2016), at 41,
https://www.state.gov/documents/organization/258876.pdf.
[36] Id. at 389.

subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[37]

54.    Despite these efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[38]

55.    Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[39]  The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[40]

56.    Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[41]

57.    The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will

---

[37] Human Rights First, *Fact Sheet 2017* (2017), http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.
[38] Sarkisian, *supra* n.14.
[39] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[40] U.S. Dep't of State, *supra* n.38, at 387.
[41] Polaris, *Human Trafficking and the Hotel Industry* (2015), https://polarisproject.org/resources/human-trafficking-and-hotel-industry.

be disturbed.

58.     Due to the hospitality industry's failure to embrace anti-trafficking policies and practices, children and other vulnerable persons are trafficked for sex in hotels throughout the United States.

59.     Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[42]   These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[43]

60.     Defendants agree that human trafficking is a problem globally, but not one brand admits that human trafficking is a problem in their business at their brand locations.

61.     Defendants' "solution" to the problem" to the problem of human trafficking is always the same—to give lip service about more employee training, and to identify some red flags related to trafficking. But this employee training has never really occurred *en masse*. For instance, according to the reporting in ECPAT's reports, the actual number of employees trained is abysmal. Moreover, although the training may provide some information in identifying trafficking, it provides no clear message on training that will serve to actively address or prevent human trafficking.

62.     Upon information and belief, reports by the Polaris Project were received and reviewed by the executives, directors and managers of Marriott, Hilton, G6 and IHG.

---

[42] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[43] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

63.     To curry more favor with the public, Defendants together, most often through state and national associations like the American Hotel & Lodging Association ("AHLA")[44]—where Defendants are all members[45]—advertise policies, practices, and procedures that indicate a unified commitment to fighting human trafficking.[46]

64.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly failed and continue to fail to heed the call or to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

**B. HOTEL DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY**

65.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

66.     The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that

---

[44] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association that represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of constituents. AHLA is diverse and represents everyone from brand CEOs to independent hotel owners, general managers, and hotel staff and is an integral contributor to the American economy. *See* American Hotel & Lodging Association, Who We Are, https://www.ahla.com/who-we-are (last visited Apr. 22, 2020).

[45] *See* American Hotel & Lodging Association, Our Members, https://www.ahla.com/our-members.

[46] *See, e.g.*, NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES (2016) (citing American Hotel and Lodging Association. 2012. "Industry Principles to Combat Human Trafficking."

if they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

67.   In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.   Thus, booking and room reservations are controlled by the corporate parent brand.[47]

68.   The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

69.   Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate.   The right of the parent hotel brand to enforce their brand standards is also their responsibility.

70.   At the time of the incidents alleged herein:

    a.   Defendant Marriott owned and controlled the Marriott® brand,

    b.   Defendant Hilton owned and controlled the Hilton®, Garden Inn®, Embassy Suites® brands,

    c.   Defendant G6 owned and controlled the Motel 6® brand,

    d.   Defendants SCH and HHF owned and controlled the Holiday Inn® brand.

---

[47] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

71.     Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments.

72.     Defendants magnify their influence and control over the hospitality industry through their membership and activity in trade associations such AHLA.

73.     Upon information and belief, all Defendants are members of AHLA, and Defendants have served on executive committees or as board members in AHLA,[48] or other state and national associations since at least 2008.[49]

74.     The AHLA serves as a forum for the Defendants to discuss efforts related to human trafficking and serves as a voice from which the Defendants can address the issue with the public.

75.     Through national hotel industry trade associations, Defendants disseminated very specific talking points to provide to the government, law enforcement, the public, and the media. These talking points amounted to nothing but spin whereby defendants tote themselves as heroes. These were more than advertising campaigns. They were part of a concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers away from the brands and assure them that the hotel industry, and Defendants specifically, were meaningfully addressing the industry-wide problem of human trafficking. By representing to the public and to legislators "the industry's ongoing commitment and work to end human trafficking" the Defendants assumed the responsibility of meaningfully addressing human trafficking at their branded properties.[50]

76.     Upon information and belief, between at least 2008 to 2019 Defendant Hilton held meetings among its executives, directors, and managers at which sex trafficking in its hotels was

---

[48] *See* https://www.ahla.com/press-release/ahla-announces-2020-officers-board-executive-committee-amid-record-membership.
[49] *See* American Hotel & Lodging Association, Partner State Associations, *https://www.ahla.com/psa*.
[50] *See* https://www.ahla.com/issues/human-trafficking.

discussed.

77.    Upon information and belief, between at least 2008 to 2019, Defendant Marriott held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

78.    Upon information and belief, between at least 2008 to 2019, IHG held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

79.    Upon information and belief, between at least 2008 to 2019, Defendant G6 held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

80.    Upon information and belief, between at least 2008 to 2019 Defendants held meetings through its trade organizations in which sex trafficking in its hotels was discussed.

81.    Upon information and belief, during at least the 2008 to 2019 time period, emails were exchanged by employees of the Defendants' respective brands that related to sex trafficking in hotels including Defendants' hotels.

82.    As industry leaders, Defendants each failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brands to perpetuate the lie that sex trafficking was not a problem on their brand properties. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

83.    Hotel Defendants collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room;

did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access.  In short, Defendants refused to communicate to traffickers "your business and your money are not welcome here."

84.     Through this coordinated effort, Defendants were able to rest assured they would not have to implement effective policies and procedures. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all trafficking ventures occur at hotels and motels—there can be no doubt that Defendants, as an industry, generate billions of dollars every year from human trafficking ventures.

85.     Defendants' coordinated efforts created an industry facade that steps were being taken to combat human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded properties. While it would be challenging and expensive (both business expenses and lost revenues from traffickers or commercial sex) to implement effective policies, it is apparent that an effective policy would create a long-term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

### C.  HOTEL DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS

86.     Defendant Hotels, Marriott, Hilton, G6, and IHG have been on notice of repeated incidences of sex trafficking occurring at their Marriott, Hilton, Garden Inn, Embassy Suites, Motel 6, and Holiday Inn brand hotels yet these parent or brand managers failed to take the necessary action to combat sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

87.     Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[51]

88.     MARRIOTT INTERNATIONAL, INC. ("MARRIOTT"):

    a.   Defendant Marriott owns, supervises, or operates the Marriott Stanton Hotel located at 161 Ocean Drive, Miami Beach, Florida 33139 where L.H. was trafficked.  Marriott failed to implement and enforce any of its own policy or policies and protect Plaintiff L.H. from being sex trafficked.

    b.   Defendant Marriott voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations. However, Marriott failed to implement its own policies and those recommended to it by the ECPAT advocacy organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of L.H.

    c.   Upon information and belief, L.H. alleges that Marriott implemented means in

---

[51] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007).

which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d.  Defendant Marriott knew of sex trafficking occurring on its branded hotel properties. Defendant Marriott and Marriott® branded properties, including the Marriot Stanton Hotel, knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Defendant Marriott and Marriott® branded properties, including the Marriot Stanton Hotel, knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet, Defendant Marriott and Marriott® branded properties, including the Marriot Stanton Hotel, allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Marriot Stanton Hotel. Specifically, Defendant Marriott and Marriott® branded properties, including the Marriott Stanton Hotel, facilitated the trafficking through their practices, policies, and procedures. Defendant Marriott and Marriott® branded properties, including the Marriott Stanton Hotel, failed to take appropriate action to prevent the trafficking of individuals for sex so that Defendant Marriott and Marriott® branded properties, including the Marriott Stanton Hotel, could continue to profit from the business that trafficking brings, including business from out-of-state.

e.  Defendant Marriott should have known of sex trafficking occurring on its branded hotel properties. Defendant Marriott and Marriott® branded properties, including

33

the Marriott Stanton Hotel, knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Defendant Marriott and Marriott® branded properties, including the Marriott Stanton Hotel, knew that all of this violent and criminal activity was occurring at their branded properties, and therefore they knew that sex trafficking was occurring at their branded properties. Yet Defendant Marriott and Marriott® branded properties, including the Marriott Stanton Hotel, allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Marriott Stanton Hotel. Defendant Marriott and Marriott® branded properties, including the Marriott Stanton Hotel, facilitated the trafficking through its practices, policies, and procedures. Marriott and Marriott® branded properties, including the Marriott Stanton Hotel, failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott and Marriott® branded properties, including the Marriott Stanton Hotel, could continue to profit from the business that trafficking brings, including business from out-of-state.

f.  Marriott knew or should have known that the Marriott Stanton Hotel where L.H. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when L.H. was trafficked.

g.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Marriott has repeatedly failed to stop these actions.

h.  Marriott was in an agency relationship with Marriott® branded properties, including the Marriott Stanton Hotel, offering public lodging services in the hotel. This agency relationship was created through Defendant Marriott's exercise of an ongoing and systemic right of control over Marriott® branded properties, including the Marriott Stanton Hotel, by Defendant Marriott's operations, including the means and methods of how Marriott® branded properties, including the Marriott Stanton Hotel, conducted daily business through one or more of the following actions:

i.  providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

ii.  providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

iii.  providing new hire orientation on human rights and corporate responsibility;

iv.  providing training and education to Marriott® branded properties, including the Marriott Stanton Hotel, through webinars, seminars, conferences, and online portals;

v.  providing and controlling customer review and response platforms;

vi.   hosting online bookings on Defendant Marriott's domain;

vii.  requiring Marriott® branded properties, including the Marriott Stanton Hotel, to use Defendant Marriott's customer rewards program;

viii.  requiring Marriott® branded properties, including the Marriott Stanton Hotel, to use Defendant Marriott's property management software;

ix.  requiring Marriott® branded properties, including the Marriott Stanton Hotel, to

use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

   x.  providing IT support for all property management systems, owned, operated and required by Marriott;

  xi.  setting employee wages;

  xii.  making employment decisions;

 xiii.  advertising for employment;

 xiv.  sharing profits;

  xv.  standardized training methods for employees;

 xvi.  building and maintaining the facility in a manner specified by the owner;

 xvii.  standardized or strict rules of operation;

xviii.  regular inspection of the facility and operation by owner;

 xix.  fixing prices; or

  xx.  other actions that deprive Marriott® branded properties, including the Marriott Stanton Hotel, of independence in business operations.

i.  Upon information and belief, Defendant Marriott could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Marriott's management and control and included all of the indicia of L.H.'s trafficking. This data included the details of L.H.'s check-in, the internet activity associated with her reservation, including access to craigslist.org to post advertisements from the hotel, access to other online

websites known for sexual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

j. An apparent agency also exists between Defendant Marriott and Marriott® branded properties, including the Marriott Stanton Hotel. Defendant Marriott held out Marriott® branded properties, including the Marriott Stanton Hotel, to the public as possessing authority to act on its behalf. Defendant Marriott clothed Marriott® branded properties, including the Marriott Stanton Hotel, with apparent authority to act for Defendant Marriott in the following ways: by requiring the use of Marriott signs, providing Marriott branded stationery, requiring the use of Marriott's website and Marriott's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Marriott guest rewards programs. On information and belief, Defendant Marriott's conduct reasonably led L.H.'s perpetrator to believe that the Marriott Stanton Hotel, had the authority it purported to have, and L.H. was injured as a result.

k. Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including the Marriott Stanton Hotel, Defendant Marriott breached its duties in the following ways:

    i. did not adequately distribute information to assist employees in identifying human trafficking;

ii.  failed to mandate a process for escalating human trafficking concerns within the organization;

iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

iv.  failed to provide new hire orientation on human rights and corporate responsibility;

v.  failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.  failed to develop and hold or require ongoing training sessions on human trafficking; or

vii.  failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii.  failed to evaluate universal reservation systems for suspicious booking activities;

ix.  failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x.  failed to ban cash or prepaid credit cards as payment; and

xi.  failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.org, from being accessed via hotel internet service.

l.  Upon information and belief, Defendant Marriott requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that

Defendant Marriott specifies and requires.[52]

m.  Upon information and belief, Defendant Marriott requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Marriott access to the internet data.

n.  Defendant Marriott states in its privacy policy that it collects the following categories of information from hotel guests: contact information such as name, gender, postal address, telephone number, email address; financial information such as credit and debit card number or other payment data; date and place of birth; membership or loyalty program data; social media account IDs, profile photos or data made available by linking social media and loyalty accounts; biometric data; images and video and audio data via security cameras in public areas and body-worn cameras carried by loss prevention officers and other security personnel; and other technological data including a customer's browser or device, data collected when downloading or using an app; cookies that collect data such as time spent on online services, pages visited, and IP addresses.[53]

o.  Defendant Marriott retains and can view internet access which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

---

[52] *See* https://blueportwireless.com/gpns-certified/ ("On May 22, 2013, Blueport Wireless becomes the first vendor to be certified in the 2013 Marriott Global Property Network Standard."); *see also* https://www.deepbluecommunications.com/industries/hotel-wifi/marriott/ ("Deep Blue has been a Marriott GPNS Certified Hotel WiFi Vendor since 2011.").
[53] *See* Marriott International, Inc.'s Privacy Policy, https://www.marriott.com/about/privacy.mi#data-covered.

p.  Marriott's centralized property management system[54] also gains Marriott access to hotels guest information registration, including names, date of booking, and length of stay.

q.  Upon information and belief, Defendant Marriott can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

r.  Upon information and belief, Defendant Marriott has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[55]

s.  Upon information and belief, Defendant Marriott can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

t.  Upon information and belief, and contrary to ECPAT best practices, Defendant Marriott failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

---

[54] *See, e.g.,* Marriott International Selects Cloud-based MICROS OPERA as Its Next-Generation Property Management System for all North America Properties, https://www.prnewswire.com/news-releases/marriott-international-selects-cloud-based-micros-opera-as-its-next-generation-property-management-system-for-all-north-america-properties-204731811.html.

[55] *See* Marriott to Pay $600,000 to Resolve Wi-Fi Blocking Investigation, *available at* https://assets.documentcloud.org/documents/1308852/doc-329743a1.pdf*; see also, e.g.,* https://traveltips.usatoday.com/hotels-track-internet-usage-111659.html ("the hotel's server usually has a log file that lists every connection the server makes for its users while they browse using its network.").

u. Upon information and belief, Defendant Marriott's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Residence Inn where Plaintiff was trafficked for sex.

v. Despite access to information comprising clear sex trafficking indicators, Defendant Marriott continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

w. Upon information and belief, Defendant Marriott monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

x. Upon information and belief, Defendant Marriott provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Marriott controls and houses this collective data from all branded properties.

y. Thus, for several years, Defendant Marriott has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Marriott® branded properties, including the Marriott Stanton Hotel, throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of L.H. at Marriott® branded properties, including the Marriott Stanton Hotel, that forms the basis of this complaint.

z. Additionally, Defendant Marriott has been aware of sex trafficking on its brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on

Marriott brand properties and Defendant Marriott's inattentiveness.

aa. Upon information and belief, Defendant Marriott monitors customer reviews and complaints for all brand properties.

bb. Upon information and belief, the branded properties depend on Defendant Marriott for notification of negative customer reviews.

cc. Upon information and belief, Defendant Marriott, not the branded properties, house and control the data regarding customer reviews.

89.    HILTON WORLDWIDE HOLDINGS, INC. ("HILTON"):

a. Defendant Hilton owns, supervises, or operates the Hilton Bentley Hotel located at 101 Ocean Drive, Miami Beach, Florida 33139, the Hilton Miami Downtown Hotel located at 1601 Biscayne Boulevard, Miami, Florida 33132, the Hilton Garden Inn Miami South Beach Hotel ("Hilton Garden Inn") located at 2940 Collins Avenue, Miami Beach, Florida 33140, and the Embassy Suites by Hilton Miami International Airport Hotel ("Hilton Embassy Suites") located at 3974 NW South River Drive, Miami, Florida 33142 where L.H. was trafficked.  Hilton failed to implement and enforce any of its own policy or policies and protect L.H. from being sex trafficked.

b. Defendant Hilton voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations. However, Hilton failed to implement its own policies and those recommended to it by the ECPAT advocacy organization which led to the inevitable consequence of

continued trafficking at its branded properties, including the trafficking of L.H.[56]

c.  Upon information and belief, L.H. alleges that Hilton implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d.  Defendant Hilton knew of sex trafficking occurring on its branded hotel properties. Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet, Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Hilton Bentley Hotel, the Hilton Miami Downtown Hotel, the Hilton Garden Inn, and the Hilton Embassy Suites. Specifically, Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, facilitated the trafficking through their practices, policies, and procedures.  Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, failed to take appropriate action

---

[56] Upon information and belief, Hilton joined ECPAT, at the latest, in 2011. See Hilton Worldwide Signs Tourism Code of Conduct, Joins ECPAT-USA in Fight Against Child Trafficking in the Travel Sector, HILTON NEWSROOM (Apr. 14, 2011), https://newsroom.hilton.com/corporate/news/hilton-worldwide-signs-tourism-code-of-conduct-joins-ecpatusa-in-fight-against-child-trafficking-in-the-travel-sector.

to prevent the trafficking of individuals for sex so that Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, could continue to profit from the business that trafficking brings, including business from out-of-state.

e. Defendant Hilton should have known of sex trafficking occurring on its branded hotel properties. Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, knew that all of this violent and criminal activity was occurring at their branded properties, and therefore they knew that sex trafficking was occurring at their branded properties. Yet Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Hilton Bentley Hotel, the Hilton Miami Downtown Hotel, the Hilton Garden Inn, and the Hilton Embassy Suites. Defendant Hilton and Hilton branded properties, including the Garden Inn® and Embassy Suites®, facilitated the trafficking through its practices, policies, and procedures. Marriott and Marriott® branded properties, including the Hilton Bentley Hotel, the Hilton Miami Downtown Hotel, the Hilton Garden Inn, and the Hilton Embassy Suites, failed to take appropriate action to prevent the trafficking of individuals for sex so that Hilton and Hilton branded

properties, including the Garden Inn® and Embassy Suites®, could continue to profit from the business that trafficking brings, including business from out-of-state.

f.   Hilton knew or should have known that the Hilton Bentley Hotel, the Hilton Miami Downtown Hotel, the Hilton Garden Inn, and the Hilton Embassy Suites where L.H. was trafficked were in areas known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when L.H. was trafficked.

g.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Hilton has repeatedly failed to stop these actions.

h.   Hilton was in an agency relationship with Hilton®, Garden Inn®, and Embassy Suites® branded properties, including the Hilton Bentley Hotel, the Hilton Miami Downtown Hotel, the Hilton Garden Inn, and the Hilton Embassy Suites, offering public lodging services in the hotels.  This agency relationship was created through Defendant Hilton's exercise of an ongoing and systemic right of control over Hilton®, Garden Inn®, and Embassy Suites® branded properties by Defendant Hilton's operations, including the means and methods of how Hilton®, Garden Inn®, and Embassy Suites® branded properties conducted daily business through one or more of the following actions:

   i.   providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

   ii.   providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

iii.   providing new hire orientation on human rights and corporate responsibility;

iv.   providing training and education to Hilton®, Garden Inn®, and Embassy Suites® branded properties through webinars, seminars, conferences, and online portals;

v.   providing and controlling customer review and response platforms;

vi.    hosting online bookings on Defendant Hilton's domain;

vii.   requiring Hilton®, Garden Inn®, and Embassy Suites® branded properties to use Defendant Hilton's customer rewards program;

viii.   requiring Hilton®, Garden Inn®, and Embassy Suites® branded properties to use Defendant Hilton's property management software;

ix.   requiring Hilton®, Garden Inn®, and Embassy Suites® branded properties to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.   providing IT support for all property management systems, owned, operated and required by Hilton;

xi.   setting employee wages;

xii.   making employment decisions;

xiii.   advertising for employment;

xiv.   sharing profits;

xv.   standardized training methods for employees;

xvi.   building and maintaining the facility in a manner specified by the owner;

xvii.   standardized or strict rules of operation;

xviii.   regular inspection of the facility and operation by owner;

xix.   fixing prices; or

xx.   other actions that deprive Hilton®, Garden Inn®, and Embassy Suites® branded properties of independence in business operations.

i.   Upon information and belief, Defendant Hilton could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location.   All of this data information was under Defendant Hilton's management and control and included all of the indicia of L.H.'s trafficking.   This data included the details of L.H.'s check-in, the internet activity associated with her reservation, including access to craigslist.org to post advertisements from the hotel, access to other online websites known for sexual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

j.   An apparent agency also exists between Defendant Hilton and Hilton®, Garden Inn®, and Embassy Suites® branded properties.   Defendant Hilton held out Hilton®, Garden Inn®, and Embassy Suites® branded properties to the public as possessing authority to act on its behalf.   Defendant Hilton clothed Hilton®, Garden Inn®, and Embassy Suites® branded properties with apparent authority to act for Defendant Hilton in the following ways:

i.   by requiring the use of Hilton signs;

ii.   by providing Hilton®, Garden Inn®, or Embassy Suites® branded stationery;

    iii.  by requiring the use of Hilton's website

    iv.  by requiring the use of Hilton's mandated 1-800 toll-free number for guest reservations; and

    v.  by requiring the implementation of Hilton guest rewards programs.

k.  On information and belief, Defendant Hilton's conduct reasonably led L.H.'s perpetrator to believe that the Hilton Bentley Hotel, the Hilton Miami Downtown Hotel, the Hilton Garden Inn, and the Hilton Embassy Suites, had the authority they purported to have, and L.H. was injured as a result.

l.  Given Defendant Hilton's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including hotels under the Hilton®, Garden Inn®, or Embassy Suites® brands, Defendant Hilton breached its duties in the following ways:

    i.  did not adequately distribute information to assist employees in identifying human trafficking;

    ii.  failed to mandate a process for escalating human trafficking concerns within the organization;

    iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv.  failed to provide new hire orientation on human rights and corporate responsibility;

    v.  failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi.  failed to develop and hold or require ongoing training sessions on human

trafficking; or

    vii.  failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention

   viii.  failed to evaluate universal reservation systems for suspicious booking activities;

    ix.  failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

    x.  failed to ban cash or prepaid credit cards as payment; and

    xi.  failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.org, from being accessed via hotel internet service.

m.  Upon information and belief, Defendant Hilton requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant Hilton specifies and requires.[57]

n.  Upon information and belief, Defendant Hilton requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Hilton access to the internet data.

o.  Defendant Hilton states in its privacy policy that it collects the following categories of information from hotel guests: Name, Contact information (mailing address, email address, phone number), Nationality,  Date of birth, Gender, Payment card

---

[57] *See* https://www.deepbluecommunications.com/industries/hotel-wifi/ (featuring "Our Hotel Partners" as Hilton, Marriott, Wyndham Hotel Group, and Hyatt).

information, Hilton Honors number, Passport information, Preferred language, Room preference, Room selection and assignment, Arrival Time, Additional guest names, Corporate travel planner contact information (name, title, company, business phone, email and address), Corporate number and name, Travel agent number and name, Airline partner number and name, Vehicle information, Images or footage captured by closed circuit television (CCTV), Internet or other electronic network activity information, including information regarding a customer's interaction with Hilton websites, applications, or advertisements, IP addresses, Session IDs, Booking engine, Whether a customer has a Hilton and American Express Co-Branded Credit Card, Whether a customer's Hilton and Amazon accounts are linked, Whether a customer's Hilton and Lyft accounts are linked, Geolocation information, Device information, Social media information, Demographics data, a customer's usability preferences regarding Hilton's website (such as a customer's email preferences, MyWay preferences, and opt-out preferences), Description of a complaint that a customer makes to Hilton, including a customer's free form textual feedback if the customer is a Hilton Honors member, Customer ratings and survey responses, and Free form textual feedback.[58]

p.  Defendant Hilton retains and can view internet access which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

---

[58] *See* Hilton Worldwide Holdings Inc. Global Privacy Statement, last updated August 12, 2020, https://hiltonhonors3.hilton.com/en/policy/global-privacy-statement/index.html.

q.  Hilton's centralized property management system[59] also gains Hilton access to hotels guest information registration, including names, date of booking, and length of stay.

r.  Upon information and belief, Defendant Hilton can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

s.  Upon information and belief, Defendant Hilton has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[60]

t.  Upon information and belief, Defendant Hilton can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including L.H.'s advertisements on Craigslist.org.

u.  Upon information and belief, and contrary to ECPAT best practices, Defendant Hilton failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

v.  Upon information and belief, Defendant Hilton's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Hilton®, Garden Inn®,

---

[59] *See* Hilton ONQ Solutions for your Business, https://www.alphansotech.com/hilton-onq-software-solutions; *see also* Hilton ONQ - Alphansotech, https://youtu.be/_2EHKwxNbyo
[60] *See e.g*., https://traveltips.usatoday.com/hotels-track-internet-usage-111659.html ("[T]he hotel's server usually has a log file that lists every connection the server makes for its users while they browse using its network.").

and Embassy Suites® branded properties where L.H. was trafficked for sex.

w.   Despite access to information comprising clear sex trafficking indicators, Defendant Hilton continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought L.H.

x.   Upon information and belief, Defendant Hilton monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

y.   Upon information and belief, Defendant Hilton provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel.  Defendant Hilton controls and houses this collective data from all branded properties.

z.   Thus, for several years, Defendant Hilton has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Hilton®, Garden Inn®, and Embassy Suites® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of L.H. at Hilton®, Garden Inn®, and Embassy Suites® branded properties that forms the basis of this complaint.

aa.  Additionally, Defendant Hilton has been aware of sex trafficking on its brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Hilton brand properties and Defendant Hilton's inattentiveness.

bb.  Upon information and belief, Defendant Hilton monitors customer reviews and complaints for all brand properties.

    cc. Upon information and belief, the branded properties depend on Defendant Hilton for notification of negative customer reviews.

    dd. Upon information and belief, Defendant Hilton, not the branded properties, house and control the data regarding customer reviews.

90.    G6 HOSPITALITY, LLC ("G6"):

    a. G6 failed to implement and enforce any of its own policy or policies and protect Plaintiff L.H. from being sex trafficked.

    b. Defendant G6 voluntarily assumed the responsibility to implement sufficient policies to combat the known problem of sex trafficking at its branded properties through its activities with the AHLA and other trade organizations. However, G6 failed to implement its own policies and those recommended to it by the above mentioned trade organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of L.H.

    c. Upon information and belief, Plaintiff alleges that G6 implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

    d. Defendant G6 knew of sex trafficking occurring on its branded hotel properties. G6 and Motel 6® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. G6 and Motel 6® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet G6 and Motel 6® allowed, authorized, permitted, induced, or encouraged the

trafficking of individuals for sex at the Motel 6®. Specifically, G6 and Motel 6® facilitated the trafficking through its practices, policies, and procedures. G6 and Motel 6® failed to take appropriate action to prevent the trafficking of individuals for sex so that G6 and Motel 6® could continue to profit from the business that trafficking brings, including business from out-of-state.

e.  Defendant G6 should have known of sex trafficking occurring on its branded hotel properties. G6 and Motel 6® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. G6 and Motel 6® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew or should have known that sex trafficking was occurring at their branded properties. Yet, G6 and Motel 6® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Motel 6®. G6 and Motel 6® facilitated the trafficking through its practices, policies, and procedures. Specifically, G6 and Motel 6® failed to take appropriate action to prevent the trafficking of individuals for sex so that G6 and Motel 6® could continue to profit from the business that trafficking brings, including business from out-of-state.

f.  G6 knew or should have known that the Motel 6® hotel where Plaintiff L.H. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff L.H. was trafficked.

g. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant G6 has repeatedly failed to stop these actions.

h. G6 was in an agency relationship with Motel 6® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant G6's exercise of an ongoing and systemic right of control over Motel 6® hotels by Defendant G6's operations, including the means and methods of how Motel 6® branded hotels conducted daily business through one or more of the following actions:

i. providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

ii. providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

iii. providing new hire orientation on human rights and corporate responsibility;

iv. providing training and education to Motel 6® branded hotels through webinars, seminars, conferences, and online portals;

v. providing and controlling customer review and response platforms;

vi. hosting online bookings on Defendant G6's domain;

vii. requiring Motel 6® branded hotels to use Defendant G6's customer rewards program;

viii. requiring Motel 6® branded hotels to use Defendant G6's property management software;

ix. requiring Motel 6® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.   providing IT support for all property management systems, owned, operated and required by G6;

xi.   setting employee wages;

xii.   making employment decisions;

xiii.   advertising for employment;

xiv.   sharing profits;

xv.   standardized training methods for employees;

xvi.   building and maintaining the facility in a manner specified by the owner;

xvii.   standardized or strict rules of operation;

xviii.   regular inspection of the facility and operation by owner;

xix.   fixing prices; or

xx.   other actions that deprive Motel 6® branded hotels of independence in business operations.

i.   Upon information and belief, Defendant G6 tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendants management and control and included all of the indicia of L.H.'s trafficking. This data included the details of L.H.'s check-in, the internet activity associated with her reservation, including Backpage.com or Craigslist.org advertisements listing the hotel's address, her location at the hotel which included the notable fact that she rarely if ever left the hotel despite extended stays, and the spike in requests for towels and other items from inventory.

j.  An apparent agency also exists between Defendant G6 and Motel 6® hotels. Defendant G6 held out Motel 6® branded hotels to the public as possessing authority to act on its behalf.

k.  Given Defendant G6's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Motel 6® branded hotels, Defendant G6 breached its duties in the following ways:

 i.  did not adequately distribute information to assist employees in identifying human trafficking;

 ii.  failed to mandate a process for escalating human trafficking concerns within the organization;

 iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

 iv.  failed to provide new hire orientation on human rights and corporate responsibility;

 v.  failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

 vi.  failed to develop and hold or require ongoing training sessions on human trafficking;

 vii.  failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

 viii.  failed to evaluate universal reservation systems for suspicious booking

activities;

   ix.  failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

   x.  failed to ban cash or prepaid credit cards as payment; and

   xi.  failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.org, from being accessed via hotel internet service.

l.  There are countless examples across place and time of Defendant G6's knowledge of its Motel 6® branded properties and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims. The illicit, criminal misconduct is so rampant on Motel 6® branded properties that one online reviewer suggested on a travel website that Motel 6® "Should be called Motel Sex."[61]

m.  Upon information and belief, Defendant G6 requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant G6 specifies and requires.

n.  Upon information and belief, Defendant G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that

---

[61] Review Of Motel 6 Rochester (Aug. 1, 2018), *available at* https://www.tripadvisor.com/ShowUserReviews-g43466-d242739-r601808847-Motel_6_Rochester-Rochester_Minnesota.html (last visited Feb. 28, 2019) (the reviewer was commenting in August 2018, on a Motel 6 located at 2107 West Frontage Road, Rochester, Minnesota 55901 and added, "Prostitutes, drug dealers, and loud partiers are your neighbors including possibly one or two staff members. Complaints to the clerk do no good. The night clerk does not write it down and the day clerks accuse you of lying although I made it clear that I did not want anything in return for my complaints.").

give Defendant G6 access to the internet data.

o. Defendant G6 (which uses the terms "G6" and "Motel 6" interchangeably within the document) states in its privacy policy that it collects the following categories of information from hotel guests:  name and contact information, customer information including addresses and government identification documents, purchase history and tendencies, biometric information, geolocation data, audio and video data (such as from "CCTV/security camera footage at our properties or offices," and internet usage data, defined as "internet or other electronic network activity information, including, but not limited to, browsing history, clickstream data, search history, and information regarding a resident's interaction with an internet website, application, or advertisement, including access logs and other activity information related to your use of any company websites, applications or other online services."[62]

p. Defendant G6 retains and can view internet access which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above. Since 2002, G6 has implemented a practice and procedure to retain network access logs, DNS logs, and Internet proxy logs on backup tape for one year.  Daily backup tapes for network access logs, DNS logs, and Internet proxy logs are overwritten

---

[62]  Motel 6 Privacy Policy, *available at* https://www.motel6.com/en/privacy.html#/ccpa, last accessed August 26, 2020.  The Policy states: "Categories are in bold. Examples of data that fall within that category provided but we do not necessarily collect all of those types of data." However, G6 does not tell consumers which kinds of data are excluded within each category. *See also* Motel 6 Operations Manual (2015), *available at* https://web.archive.org/web/20200428015955/https://extranet.g6franchising.com/LinkClick.aspx ?fileticket=jnePNlQdyAI%3D&portalid=0 (last accessed August 27, 2020).

after one year.[63]

q.  This access includes branded property hotels' guest information registration, including names, date of booking, and length of stay.

r.  Motel 6®'s High Speed Internet Terms and Conditions provides that Motel 6® has "the right . . . to monitor, intercept, and disclose any transmissions over or using the facilities related to the Service, and to provide subscriber billing, account, or use records, and related information under certain circumstances."[64]

s.  Motel 6®'s policy further provides, "You agree that we may access your computer to investigate activity that may be in violation of these Terms and Conditions; or to comply with law. You agree not to use or attempt to use the Service, the Motel 6, or Studio 6 network or website, or your computer for any fraudulent, unlawful, harassing or abusive purpose."[65]

t.  More than half of Motel 6® hotel bookings occur on the same day as arrival, data which Motel 6® executives acknowledge monitoring so that they can make the reservation process easier.

u.  Upon information and belief, Defendant G6 can therefore see when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays.

v.  Upon information and belief, Defendant G6 has the capacity to monitor and control

---

[63] *See M.L. v. Craigslist*, No. 3:19-cv-06153, Declaration of Johnie Perry, Dkt. 105-1 at ¶ 3 (W.D. Wash. May 29, 2020).
[64] Motel 6 - High Speed Internet Terms and Conditions, ¶ 9, *available at* https://www.motel6.com/hsi_tc/, last accessed July 2, 2020.
[65] *Id.*

branded property hotel guests' access through hotel Wi-Fi to certain websites.[66]

w.  Upon information and belief, Defendant G6 can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Craigslist.org.

x.  Upon information and belief, and contrary to ECPAT best practices, Defendant G6 failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

y.  Upon information and belief, Defendant G6's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com or craigslist.org and other sex buyer advertisements and websites extended to the Motel 6 where Plaintiff was trafficked for sex.

z.  Despite access to information comprising clear sex trafficking indicators, Defendant G6 continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

aa.  Defendant G6 reviews and monitors complaints at its branded hotel properties and charges properties a Guest Intervention Fee if the 12-month complaint rate is above a certain number.[67]

bb.  Upon information and belief, Defendant G6 monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

---

[66] *See, e.g.*, https://money.cnn.com/2016/07/15/news/companies/starbucks-mcdonalds-wifi-porn/index.html;
https://endsexualexploitation.org/articles/filterpublicwifi_starbucks_library_congress/.
[67] Motel 6 Operations Manual (2015), *available at*
https://web.archive.org/web/20200428015955/https:/extranet.g6franchising.com/LinkClick.aspx?fileticket=jnePNlQdyAI%3D&portalid=0 (last accessed August 27, 2020).

cc. Upon information and belief, Defendant G6 provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant G6 controls and houses this collective data from all branded properties.

dd. The sex trafficking reports involving Defendant G6's branded properties are legion. Thus, for several years, Defendant G6 has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Motel 6® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff L.H. at Motel 6® hotels that forms the basis of this complaint:

i. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[68]

ii. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[69]

iii. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[70]

iv. Police rescued an eighteen (18) year old girl from a sex trafficker in February

---

[68] *Five Toledoans Indicted On Sex Trafficking Charges*, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[69] Mark Reiter, *Two Toledoans Accused Of Juvenile Sex Trafficking*, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html.

[70] Complaint, *United States of America v. Samuel Nichols, et al.*, No. 1:15-cr-00756 (N.D. Ill. Dec. 29, 2015); *see also* Press Release, U.S. Dep't of Justice, *Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs* (Jan. 15, 2016), https://www.justice.gov/usao-ndil/file/813771/download.

2012, at a Motel 6 in Portland, Oregon.[71]

    v.   The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[72]

    vi.   The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[73]

    vii.   In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[74]

    viii.   Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[75]

    ix.   The FBI busted a sex trafficking ring operating out of a Motel 6 in San Antonio, Texas in September 2013.[76]

    x.   In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013, and charged with sex trafficking of two young women.[77]

    xi.   Police investigated a sex trafficker in March 2014 and ultimately charged him

---

[71] Press Release, U.S. Dep't of Justice, *Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims* (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[72] *FBI Investigates Human Trafficking At Madison Hotel*, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[73] *Suspects Busted In Anaheim Sex Ring*, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784/.

[74] Danielle McLean, *What Drives Maine Sex Traffickers' Inhumanity*, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/.

[75] Anne Kramer, *Man Faces Prison Time For Sex Trafficking Baltimore Teen*, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[76] Stephanie Serna, *Sex Trafficking Ring Busted At Motel 6* (Sept. 17, 2013), https://www.ksat.com/news/sex- trafficking-ring-busted-at-motel-6.

[77] *UPDATE: Man Arrested For Sex Trafficking*, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[78]

xii.   In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[79]

xiii.   In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[80]

xiv.   A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[81]

xv.   In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[82]

xvi.   A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[83]

---

[78] *Man, 25, Is Accused Of Trafficking Teens*, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/.

[79] Felix Cortez and Amy Larson, *Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel*, KSBW8 (May 9, 2014), https://www.ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after- victim-escapes-motel/1054172.

[80] David Goodhue, *Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court*, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

[81] *Las Vegas Man Charged With Human Trafficking In Rapid City*, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-city/21922915/.

[82] Stephen Peterson, *RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel* (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[83] Emilie Raguso, *Woman Charged In Berkeley Teen Sex Trafficking Case* (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-

xvii.   In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[84]

xviii.   Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[85]

xix.   In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[86]

xx.   Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[87]

xxi.   Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[88]

xxii.   In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old

---

case.

[84] Melissa Boughton, *Police Say Teen Starved, Beaten At North Charleston Hotel; Man Arrested In Sex-Trafficking Case* (Mar. 2, 2015), https://www.postandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston- motel-man/article_032153ee-fcb6-5333-9182-926a7f43dfbf.html.

[85] Lindsay Bramson, *Local Teen Saved From Sex Slavery; Two Charged*, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[86] Amanda Milkovits, *Massachusetts Man Accused Of Trafficking Teen In Warwick Motel*, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[87] Sarah Kaplan, *Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police*, The Washington Post (Apr. 28, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand- over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[88] Hsing Tseng, *Seven Indicted By Colorado Grand Jury In Child Sex Trafficking Ring Bust*, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.

girl.[89]

xxiii. A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[90]

xxiv. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[91]

xxv. In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[92]

xxvi. In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[93]

xxvii. In January 2016, a man who operated a criminal venture out of a Motel 6 in Frederick City, Maryland was charged with sex trafficking.[94]

xxviii. Criminal charges were brought against a man who sex trafficked a fifteen (15)

---

[89] Andrea Fisher, *Woman Caught Up In Human Trafficking Ring Pleads Guilty* (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads- guilty/89566374/.

[90] Diana Hefley, *County Investigating 45 Ongoing Human Sex Trafficking Cases*, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[91] *Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen*, NewsMississippi (Nov. 7, 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[92] Matt Fountain, *Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Will Stand Trial*, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[93] *Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County*, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced- to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.

[94] *Frederick Police Arrest Man On Human Trafficking Charges*, CBS13 Baltimore (Jan. 16, 2016), https://baltimore.cbslocal.com/2016/01/16/frederick-police-arrest-man-on-human-trafficking-charges/.

year old girl out of a Motel 6 in Beaumont, Texas in March 2016.[95]

    xxix.  On March 23, 2016, a victim of a sex trafficking ring died at a Motel 6 in Winchester, West Virginia.[96]

    xxx.  The leader of a sophisticated and organized sex trafficking ring beat and raped one of his victims in April 2016, at a Motel 6 in Tinicum Township, Pennsylvania.[97]

    xxxi.  A federal court sentenced a man to ten (10) years in prison in November 2016, for sex trafficking a fifteen (15) year old girl in 2014 out of a Motel 6 in Hartford County, Connecticut.[98]

    xxxii.  Local law enforcement rescued a seventeen (17) year old runaway in December 2016, who was being sex trafficked from a Motel 6 in Gibbstown, New Jersey.[99]

    xxxiii.  In February 2017, the leader of a child sex trafficking ring in Tulsa, Oklahoma, was busted at a local Motel 6 where federal authorities rescued a sixteen (16) year old survivor of sex trafficking.

    xxxiv.  A forty-five (45) year old man was charged with human trafficking after picking up a teenage boy from school and taking him to a Motel 6 in Cedar Park, Texas in approximately March 2017.[100]

---

[95] Quentin Hope, *Women Accuse Defendant Of Sex Trafficking, Threatening To Kill Them*, KFDM.com (Sept. 11, 2018), https://kfdm.com/news/local/women-accuse-defendant-of.

[96] Ellie Williams, *Martinsburg Man Convicted On Sex Trafficking And Drug Charges*, LocalDVM.com (Jan. 17, 2019), https://www.localdvm.com/news/virginia/martinsburg-man-convicted-on-sex-trafficking-drug- charges/1708490814.

[97] Justin Heinze, *Man Behind Human Trafficking Ring In Chester County Sentenced*, Patch (Sept. 26, 2017), https://patch.com/pennsylvania/phoenixville/man-behind-human-trafficking-ring-chester-county-sentenced.

[98] David Owens, *Hartford Man Sentenced To Prison For Sex Trafficking Of 15-Year-Old Girl*, Hartford Courant (Nov. 14, 2016), https://www.courant.com/news/connecticut/hc-sex-trafficking-teenager-prison-1115-20161114- story.html.

[99] Matt Gray, *Three Indicted On Charges Of Forcing Teen Into Prostitution*, NJ.com (Sept. 24, 2017), https://www.nj.com/gloucester-county/index.ssf/2017/09/post_139.html.

[100] *Little Elm Man Accused Of Trafficking Austin Teen*, KHOU11.com (Sept. 19, 2017), https://www.khou.com/article/news/local/texas/little-elm-man-accused-of-trafficking-austin-teen/285-476893013.

xxxv.   At a Motel 6 in Des Moines, Iowa a man sex trafficked a minor victim in June 2017.[101]

xxxvi.   In approximately June 2017, a seventeen (17) year old runaway was rescued by law enforcement from a Motel 6 in Las Vegas, Nevada out of which a sex trafficker was operating.[102]

xxxvii.   A seventeen (17) year old girl was sold for sex by traffickers at a Motel 6 in Portland, Oregon in June 2017.[103]

xxxviii.   In August 2017, two (2) men operated out of a Motel 6 in Springfield, Virginia to sex traffic a sixteen (16) year old girl.[104]

xxxix.   The City of Los Angeles settled a nuisance suit with G6 Hospitality, which operates Motel 6 hotels, in August 2017, for $250,000.00 in an effort to combat human trafficking at Motel 6 brand hotels.[105]

xl.   In October 2017, the County Attorney's Office for Harris County, Texas sued a local Motel 6 after law enforcement identified the property as a criminal hotspot that had been attracting drug activity, human trafficking, and violent crime for years. The suit alleged the Motel 6 knowingly tolerated and failed to make reasonable efforts to abate the criminal activities on its property.[106]

---

[101] Luke Nozicka, *Seven Des Moines Residents Charged With Sex Trafficking, Feds Say*, The Des Moines Register (Jun. 11, 2018), https://www.desmoinesregister.com/story/news/crime-and-courts/2018/06/11/7-des-moines- residents-charged-sex-trafficking-feds-des-moines-sexual-prostitution-iowa-texas/692264002/.

[102] Rachel Crosby, *Woman Accused Of Sex Trafficking Runaway On Las Vegas Strip*, Las Vegas Review-Journal (Jun. 2, 2017), https://www.reviewjournal.com/crime/sex-crimes/woman-accused-of-sex-trafficking-runaway-on- las-vegas-strip/.

[103] Nick Morgan, *Accused Human Traffickers Stopped In Medford*, Mail Tribune (Jul. 7, 2017), http://mailtribune.com/news/crime-courts-emergencies/accused-human-traffickers-stopped-in-medford.

[104] Emily Leayman, *16-Year-Old Forced To Be Prostitute At Springfield Motel: Report*, Patch (Feb. 6, 2018), https://patch.com/virginia/burke/16-year-old-forced-be-prostitute-springfield-motel-report.

[105] Michael Balsamo, *Motel 6 To Pay To Settle Human Trafficking Case*, APNews.com (Aug. 31, 2017), https://apnews.com/d13636fec55c42b88a08af18db6196fb.

[106] Mayra Cruz, *Harris County Sues Spring Area Motel Labeled Hot Spot For Crime*, Chron.com (Oct. 20, 2017),

xli.   Two (2) men were arrested in December 2017, for sex trafficking a minor female out of a Motel 6 in Destin, Florida.

xlii.   In February 2018, a man engaged in sex trafficking of two (2) women at a Motel 6 near New Orleans, Louisiana.[107]

xliii.   The Columbus City Attorney's Office issued ultimatums in February 2018, to several area hotels to clean up or shut down, including but not limited to, the Motel 6 at 7480 North High Street which, according to police, had been the site of significant criminal activity and is nearby the Motel 6 Columbus.[108]

xliv.   Law enforcement responded to a 911 call from a seventeen (17) year old girl who was calling from the lobby of a Motel 6 in Claremont, California in February 2018. Upon arrival, officers discovered that the seventeen (17) year old caller and a fifteen (15) year old girl were both being sex trafficked at the hotel.[109]

xlv.   In March 2018, police found a ten (10) year old girl wearing a dog collar with a twenty-three (23) year old man who had raped her at a Motel 6 in Lakeland, Florida.[110]

xlvi.   In Richfield, Minnesota a man was criminally charged in June 2018, for sex

---

https://www.chron.com/neighborhood/spring/news/article/Harris-County-sues-Spring-area-motel-labeled- 12293254.php.

[107] Emily Lane, *Man Accused Of Trafficking Took Females To New Orleans To 'Make Some Money For Mardi Gras'*, Nola.com (Oct. 18, 2018), https://www.nola.com/crime/2018/10/man-accused-of-trafficking-took-females- to-new-orleans-to-make-some-money-for-mardi-gras-warrant.html.

[108] Maureen Kocot, *Columbus Cracks Down On Businesses With High Crime Rates*, 10 WBNS (Feb. 7, 2018), https://www.10tv.com/article/columbus-cracks-down-businesses-high-crime-rates.

[109] Serena Fangary, *Social Media, Sexual Assault, And Sex Trafficking*, Webb Canyon Chronicle (May 23, 2018), https://webbcanyonchronicle.com/2953/features/social-media-sexual-assault/.

[110] David Neal, *Florida Man, Burger King Manager Met His Online Girlfriend For A Hotel Sex Date, Cops Say She's 10.*, Miami Herald (Mar. 29, 2018), https://www.miamiherald.com/news/local/community/miami-dade/west- miami-dade/article207303799.html.

trafficking a fifteen (15) year old girl out of an area Motel 6.[111]

xlvii.  Police busted a human trafficking operation at a Motel 6 in Ann-Arbor, Michigan in July 2018.[112]

xlviii.  A Motel 6 in Braintree, Massachusetts surrendered its operating license in September 2018, after significant criminal activity, including sex trafficking, was documented occurring on its property.[113]

xlix.  Not until September 2018, did Defendant G6 announce that "the company will introduce anti-human trafficking training to corporate, field and property team members...Additionally, the company developed its own training for all property team members to understand how to effectively intervene and identify potential trafficking situations to protect each other, guests and the community." Even after this announcement, sex trafficking at Motel 6 properties continued.

l.  In November 2018, federal authorities arrested a man for sex trafficking a woman out of a Motel 6 in San Jose, California.[114]

li.  In December 2018, a husband and wife were arrested for sex trafficking women who were Chinese nationals out of a Motel 6 in Portsmouth, New Hampshire from approximately 2016 through 2017.[115]

---

[111] *Man Charged With Sex Trafficking, Prostitution Of 15-Year-Old At Richfield Motel*, 5 ABC Eyewitness News (Jun. 19, 2018), https://kstp.com/news/man-charged-sex-trafficking-richfield-hotel/4955796/.

[112] Darcie Moran, *Man Charged With Human Trafficking At Ann Arbor-Area Hotel*, MLive.com (Dec. 7, 2018), https://www.mlive.com/news/ann-arbor/2018/12/man-charged-with-human-trafficking-at-ann-arbor-area-hotel.html.

[113] Daniel Libon, *Motel 6 Ends Fight To Reopen Braintree Location*, Patch (Sept. 19, 2018), https://patch.com/massachusetts/braintree/motel-6-ends-fight-reopen-braintree-location.

[114] *Alleged Pimp Arrested in San Jose for Sex-Trafficking Young Woman He Found on Instagram*, San Jose Inside (Nov. 9, 2018), https://www.sanjoseinside.com/2018/11/09/alleged-pimp-arrested-in-san-jose-for-sex-trafficking- young-woman-he-found-on-instagram/.

[115] Elizabeth Dinan, *Husband, Wife Charged In Sex Trafficking 'Scheme'*, Fosters.com (Dec. 14, 2018), https://www.fosters.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme.

    lii.  A fourteen (14) year old girl was held against her will at a Motel 6 in Raleigh, North Carolina and sex trafficked in or around January 2019.[116]

91.    INTERCONTINENTAL HOTELS GROUP ("IHG"):

    a.  IHG owns, supervises, operates, or manages the Holiday Inn Miami North - I-95, an IHG Hotel ("Holiday Inn"). IHG and the Holiday Inn knew or should have known that pimps and sex traffickers utilize hotels in Miami, Florida, including Holiday Inn hotels, to facilitate the trafficking of women and children for sex.

    b.  IHG and the Holiday Inn failed to implement and enforce any of their own policies and procedures to protect Plaintiff L.H. from being sex trafficked. IHG and Holiday Inn knew or should have known that the Holiday Inn hotel where Plaintiff L.H. was trafficked was in an area known for sex trafficking activity, and that sex trafficking and prostitution continued to regularly occur on and around the hotel premises, including when Plaintiff L.H. was trafficked. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, IHG and the Holiday Inn have repeatedly failed to stop these actions.

    c.  IHG exercised control over the Holiday Inn hotel by:

      i.  distributing information to assist employees in identifying human trafficking;

      ii.  providing a process for escalating human trafficking concerns within the organization;

      iii.  requiring employees to attend training related to human trafficking;

      iv.  providing new hire orientation on human rights and corporate responsibility;

---

[116] Amanda Lamb, *Third Man Arrested In Raleigh Alleged Child Trafficking*, WRAL.com, https://www.wral.com/third-man-arrested-in-raleigh-alleged-child-trafficking/18104963/ (last visited Feb. 28, 2019).

     v.   providing training and education to Crowne Plaza branded hotels through webinars, seminars, conferences, and online portals;

     vi.   developing and holding ongoing training sessions on human trafficking; or

     vii.   providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

d.  IHG was in an agency relationship with Holiday Inn branded hotels offering public lodging services in the hotel.

e.  This agency relationship was created through IHG's exercise of an ongoing and systemic right of control over the Holiday Inn hotel by IHG's operation and management, including the means and methods of how Holiday Inn branded hotels conducted daily business through one or more of the following actions:

     i.   hosting online bookings on the IHG's domain;

     ii.   requiring Holiday Inn branded hotels to use IHG's customer rewards program;

     iii.   setting employee wages;

     iv.   making employment decisions;

     v.   advertising for employment;

     vi.   sharing profits;

     vii.   standardized training methods for employees;

     viii.   building and maintaining the facility in a manner specified by the owner, operator, or manager;

     ix.   standardized or strict rules of operation;

     x.   regular inspection of the facility and operation by owner, operator, or manager;

xi.   fixing prices; or

xii.  other actions that deprive Holiday Inn branded hotels of independence in business operations.

f.   An apparent agency also exists between IHG and the Holiday Inn hotel.  IHG held out Holiday Inn branded hotels to the public as possessing authority to act on their behalf.

g.   Given IHG's public statements on behalf of their hotel brands and the control they assumed in educating, implementing, and directing their branded hotels, including Holiday Inn branded hotels, IHG breached its duties in the following ways:

i.    did not adequately distribute information to assist employees in identifying human trafficking;

ii.   failed to provide a process for escalating human trafficking concerns within the organization;

iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

iv.   failed to provide new hire orientation on human rights and corporate responsibility;

v.    failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.   failed to develop and hold or require ongoing training sessions on human trafficking; or

vii.  failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human

trafficking prevention.

h.  The Holiday Inn Miami North - I-95 is an alter ego, representative, agent, or co-conspirator of IHG. IHG exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Holiday Inn.

i.  IHG and Holiday Inn are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Holiday Inn hotel where the Plaintiff was trafficked for sex.  IHG and the Holiday Inn hotel each share the common policies and practices complained of herein.

j.  IHG and the Holiday Inn jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

k.  As an integrated enterprise and or joint employer, IHG and the Holiday Inn hotel are separately and jointly responsible for compliance with all applicable laws.

l.  As an integrated enterprise and or joint employer, IHG and the Holiday Inn are jointly and severally liable for any damages caused by employees.

m.  During the time period relevant to the allegations contained herein, the Holiday Inn was in an agency relationship with IHG and operated as public accommodations offering public lodging services in the subject hotel.  This agency relationship was created through one or more of the following actions:

 i.  sharing profits,

 ii.  standardized training methods for employees;

 iii.  building and maintaining the Holiday Inn hotels owned, operated, or managed by the Holiday Inn hotel in a manner specified by IHG;

     iv.   standardized or strict rules of operation;

     v.   the ability of IHG to cancel any agreement with the Holiday Inn hotel if rules are violated;

     vi.   regular inspection of the Holiday Inn hotel and operation or management by IHG;

     vii.   prices fixed by IHG; or

     viii.   any actions that deprive the Holiday Inn hotel of independence in business operations

n.   For years, both before and after adopting the Code, IHG has demonstrated willful blindness to the rampant culture of sex trafficking which tragically occurs on its Holiday Inn branded properties throughout the United States. This same entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of Plaintiff L.H. at the Holiday Inn hotel that forms the basis of this complaint.

o.   Even though IHG has sought and received publicity for its anti-human trafficking measures, IHG could have accessed data and databases, including from data from POLARIS, that demonstrated that the prevalence of human trafficking at IHG's brand hotels and in the hospitality industry generally. Despite the availability of such data and information, IHG ignored or turned a blind eye to the growing body of information regarding the prevalence of human trafficking at IHG brand hotels and in the hospitality industry generally and continued to profit from the human trafficking occurring at IHG brand hotels.

### D.  THE SEX TRAFFICKING OF PLAINTIFF L.H. ON CRAIGSLIST

92.    Defendant Craigslist facilitated and assisted traffickers and commercial sex buyers with

the advertisement, sale, purchase, abuse, rape, and exploitation of Plaintiff L.H. beginning

when she was a minor and continuing into adulthood.

93.    Defendant Craigslist provided a method for traffickers to arrange transportation and terms of

purchase. Defendant Craigslist first presented a user with a choice of geographic areas:

After choosing a geographical area, a buyer would be confronted with a list of categories, such as

"erotic services," or any subsection under its "personals" category.



After choosing a section such as the personal ads or erotic services sections, a buyer would choose from a scroll down list of commercial sex advertisements.

The Wayback Machine - https://web.archive.org/web/20111007172312/http://miami.craigslist.org:80/w4m/

south florida craigslist > personals > women seeking men                                    [ help ] [ post ]

| all south florida | miami / dade | broward county | palm beach co |

**women seeking men**

search for: [                    ]  in: [ women seeking men ▾ ]  ○ title only  ● entire post  [ Search ]

Poster's Age: [ min ] [ max ]                    ☐ has image

[ Fri, 07 Oct 13:20:09 ]                                              [ parental control software ]
                                        [ **search keywords :** mw4w, **w4m**, w4w, m4w, m4m, t4m, etc ]
                                        [ dial 2-1-1 for social services ] [ **AVOIDING SCAMS & FRAUD** ]
                                        [ **PERSONAL SAFETY TIPS** ] [ craigslist (tv) ] [ unofficial flagging faq ]
                                                                [ craigslist blog ] [ success story? ]

---

### Fri Oct 07

---

Romantic... But not hopeless - 24 - (Tallahassee)

LTR Wanted - 30 - (Palm Beach, FL)

fearless sex >> that's it :))) - 27 - (south florida)

desire unwind at some point tonight! ? :)) - 26 - (south florida)

girl w/ shaved vag hopin for alpha guy .... - 24 - (south florida)

Looking for a Quality Gentleman - 62 - (West Palm Beach) pic

Its Friday GUYS, U READY???? -

looking for mr. right - 24 - (Pembroke Pines)

LATIN - w4m - 50 - (BROWARD)

be yourself - 29 - (Miami Beach)

blk girl 4 white guy - 27 - (South Florida)

shy woman seriously needs an alpha man -- - 26 - (south florida)

fun-loving, energetic woman - 24 - (Lauderhill)

Cutie w/ a booty - 24 - (South Beach)

I can't believe I'm still single - 36 - (west palm beach)

94.    Upon clicking on an advertisement, Craigslist had arranged its website so that a specified

       number of photographs appeared per page, along with contact information and a general

       description of the trafficking victim's location. Defendant Craigslist facilitated customers'

       access to trafficking victims in their desired geographic area, and it made it easy for sex

       traffickers to promote their adult victims and minor children across the nation according

to supply and demand. Defendant Craigslist's activity encouraged and allowed sex traffickers to efficiently market victims such as Plaintiff L.H. to buyers and rapists all over the country.

95. Defendant Craigslist required that a post not directly suggest sexual favors for money,[117] leading to suspiciously coded language like "200 INCALL SPECIAL," "80 special all night," and "130 HR GORGEOUS SLENDER MODEL," which remained posted without removal or inquiry. Remaining on the advertisement section allowed buyers to search and query advertisements based on price, features, and importantly location.

96. Advertisements on Craigslist required that a location be designated so that buyers and child rapists would be able to search based on the location of L.H., who had specific features that were also listed and searched for based on Defendant Craigslist's "terms of use" and widely used descriptors.

97. Instead of preventing illegal commercial sex acts with children and victims like L.H., Craigslist's content requirements became guidelines which allowed the Defendant Craigslist, providers, and buyers to evade law enforcement, while arranging for payment terms, travel and transportation of victims to specific locations.

98. The policy promulgated by Defendant Craigslist that images were to be blurred and cropped became a commonly used technique to obscure the identity and age of L.H. and other trafficking victims, including missing children, runaways or other victims who were sought by police and concerned parents.

99. The use of aliases is another common feature of the commercial sex advertisements on Craigslist. Defendant Craigslist allowed sex traffickers to use these aliases to evade law

---

[117] *See* Exhibit 1.

enforcement and this feature is another example of how Defendant Craigslist knew that its website was being used for commercial sex. True identifications of the Plaintiff L.H., as well as countless other victims advertised, were encouraged to be hidden.

100. The requirement that sex traffickers use their credit card and telephone number in order to post was another means by which a trafficker and Defendant Craigslist evaded law enforcement under the ruse of increased security. Traffickers would regularly use a pre-paid credit card and a burner phone in order to obfuscate their identity, and Defendant Craigslist took no extra steps to acquire the actual identity of these traffickers. Defendant Craigslist enabled sex traffickers to continue to provide, harbor, and buy victims from its website with complete anonymity.

101. The "erotic services" and "personals" categories were terms and wording specifically created and selected by Defendant Craigslist to define every advertisement contained in its respective category or section. Sex traffickers, including commercial sex buyers, knew that Craigslist was an advertising service which displayed commercial sex advertisements and allowed commercial sex buyers to illegally procure sex with "willing" adults engaged in prostitution, as well as "unwilling" victims of sex trafficking, including minors.

102. In addition to the tremendous number of commercial sex advertisements on the Craigslist "erotic services" section of its website, other subsections of the Craigslist website were home to multitudes of advertisements for illegal commercial sex activity. The sections for dating and massage services were rife with illegal commercial sex advertisements. Craigslist was a known destination for commercial sex advertisements and as such, aided traffickers and others who would commonly post commercial sex advertisements in sections entitled "casual encounters," "women seeking men," "men seeking men," "men

seeking women," and others. Sex buyers could locate advertisements and connect with victims in multiple categories.

103.   Defendant Craigslist's website facilitated and assisted commercial sex buyers with contact and communication with traffickers who would provide victims to perform commercial sex acts. All communications with advertisers, including with traffickers, routed through the use of an internal email system embedded in the Craigslist website. This unique communication system allowed traffickers and buyers of commercial sex acts to remain anonymous and hidden while communicating through the Craigslist email system.

104.   Craigslist's email system, combined with the enormous reach and popularity of its website, allowed sex traffickers to market, sell, and trade sex trafficking victims, including minors like the minor Plaintiff L.H., and connect traffickers and commercial sex buyers in an anonymous and covert fashion. Defendant controlled its email communication system, allowing the exact location and identities of victims and buyers to remain hidden from law enforcement and other agencies.

105.   Defendant Craigslist was well aware that many of the advertisements in the "erotic services" category were advertisements for sex with children. Moreover, Craigslist provided cover for advertisements of minors by requiring sex traffickers to click on the "posting rules" page which has a line asserting, "I am at least 18 years of age or older and not considered to be a minor in my state of residence."

106.   Before each advertisement was listed, the advertisement would be submitted to Craigslist for review before it was posted to its "erotic services" section. Nevertheless, Craigslist did nothing to verify the actual age of the person being advertised and took no meaningful initiative to verify the actual identity of the posters, such as requiring the IP addresses and

personal information of the owner and operator of the device used to post the advertisements. Defendant Craigslist's lack of effort was an attempt to evade the criminal penalties of promoting underage sex trafficking and secure Defendant's profit margins from the increased web traffic that erotic services garnered.

107. Defendant Craigslist was on notice of the human sex trafficking, including that of children, taking place on its website service from numerous sources, including but not limited to, lawsuits, government action, public outcry, news media, victims, activities, and employee observation.

108. By 2009, Defendant Craigslist was well aware that its website was hosting thousands and thousands of sex trafficking and illegal prostitution advertisements throughout the United States, including advertisements of children. Craigslist was well aware that its website hosted, facilitated, and aided and abetted criminal sex trafficking and others to engage in criminal acts of sex trafficking, including the sex trafficking of minors. In fact, Craigslist was the target of a vocal and well-publicized effort to change its conduct and stop allowing illegal sex trafficking from occurring on its website.

109. After growing pressure from the public and law enforcement, it created nominal, ineffective requirements that became instructions to sex traffickers on evading law enforcement. Defendant Craigslist developed these content requirements to maintain its benefit from its participation in illicit commercial sex.

110. Defendant Craigslist benefited from the huge numbers of prostitution and sex trafficking advertisements that it allowed and encouraged on its website. Defendant Craigslist charged a fee for advertisements on its "erotic services" subsection, thereby helping its business with cash flow, credit ratings, and competitive standing, as well as other financial

and business-related benefits.

111.    Defendant Craigslist also benefited from the huge traffic generated by the volume of users attracted to its website by the commercial sex advertisements it allowed and encouraged on its website. According to consulting firm, AIM Group, in 2008, Craigslist was on track to make $44,000,000.00 in fees from the erotic services section of its website before it was shut down later that year. This analysis was based on the firm's close monitoring of Craigslist, which found that there were over four million (4,000,000) posts made annually in the designated "erotic services" section.

112.    Human trafficking earns profits of approximately $150 billion a year for traffickers.[118] Minor sex trafficking generates billions of dollars a year in the United States through the trafficking of well over 200,000 children.[119] Seventy-five percent of these minors are sex trafficked online.[120]  Defendant Craigslist was a major progenitor of this crisis, and Defendant Craigslist profited directly from the facilitation of child sex trafficking of thousands of victims, including Plaintiff L.H.  Pedophiles and those seeking child victims for sexually explicit and commercial sex acts would visit Craigslist in the thousands every day to seek out the right price and child for purchase.

113.    While Defendant Craigslist maintained the erotic services section, the Polaris Project, a group against human trafficking, believed that Craigslist was the single largest source for

---

[118] "Human Trafficking by the Numbers." January 7, 2017. Human Rights First. Available at: https://www.humanrightsfirst.org/resource/human-trafficking-numbers (last visited February 12, 2021).

[119] U.S. Department of Justice. 2004. *Report to Congress from Attorney General John Ashcroft on U.S. Government Efforts to Combat Trafficking in Persons in Fiscal Year 2003*. Washington, D.C.: U.S. Department of Justice.

[120] Thorn.org. 2021.*Child Sex Trafficking Statistics*. Available at: https://www.thorn.org/child-trafficking-statistics/ (last visited February 12, 2021).

illicit commercial sex with adults and children. Defendant Craigslist enabled this behavior and gave both sex traffickers and its customers the means to evade law enforcement. Through this facilitation, Craigslist gained a substantial user base making it the ninth most visited website in the country in 2009. The increase in user base generated traffic to the other paid services of Craigslist and provided a direct financial benefit to Defendant Craigslist.

114.    In May of 2009, Defendant Craigslist chose to re-label its erotic services section to "adult services," but the forum functioned in exactly the same ways and Plaintiff L.H. continued to be trafficked. Then in 2010, Defendant Craigslist terminated its adult services section, and the sex traffickers simply increased the number of posts in the personal ads and massage services sections. In fact, Defendant Craigslist already knew that traffickers had been using its other sections to avoid the content requirements of erotic services.

115.    Despite Defendant Craigslist's knowledge that its erotic services section was a forum for facilitating adult and child sex trafficking, it kept the erotic services section a part of its website for over 10 years.

116.    Sex traffickers, prostitutes, and sex customers all knew from long association and usage on Craigslist.org that Craigslist was a friendly forum for sex trafficking advertisements. Accordingly, sex trafficking advertising continued on Craigslist, unabated, in different sections. A tremendous amount of sex trafficking advertising simply transferred over to other areas of the website such as "causal encounters," which had always been a platform for sexual advertisements. Defendant Craigslist knew this was occurring and did nothing to abate or prevent sex ads from appearing on its website. These subsections survived on Craigslist and sex trafficking advertisements continued unabated until 2018 when

FOSTA/SESTA was passed, after Plaintiff L.H. had been trafficked for 10 years prior.

117.   After 20 years of being a platform for sex trafficking, including the trafficking of Plaintiff L.H., Defendant Craigslist shut down its "personals" section as a result of the codification of FOSTA in 2018. Sex trafficking has been and remains illegal, and at no time that Defendant Craigslist participated in arranging for commercial sex acts with minors was that activity legal or permitted by any laws in Florida or the United States. The Communications Decency Act (CDA), 47 U.S.C. § 230, was not intended to protect the arrangement of illegal commercial sex acts with children or adult victims of human trafficking. Arguably, FOSTA made it clear that the law would now be enforced against internet and web-based companies that advertised sex trafficking.

118.   During the 20 years Defendant Craigslist maintained its "erotic services" section and "personals" categories, Defendant Craigslist benefited from the continued sale and trafficking of children for sex, and only chose to end its participation once its liability for criminal and civil punishment became certain.

119.   Plaintiff L.H. was approximately 15 years old when she became controlled by an adult sex trafficker and sold to be raped by adult sex customers in specific locations designated by Craigslist advertisements.   Plaintiff L.H. was trafficked for over a decade between the approximate years of 2008 to 2019 when she was between the ages of fifteen (15) and twenty-six (26).

120.   Plaintiff's traffickers took sexually explicit photographs of L.H., including nude and partially nude photographs, and used the photographs in conjunction with specific wording to create advertisements readily ascertainable as advertisements for commercial sex acts with the minor L.H. in selected cities. Plaintiff's trafficker would develop the sex

advertisements in conjunction with Craigslist's "terms of use" rules and guidelines promulgated and required by Craigslist to utilize the Craigslist classified advertising website. The rules and guidelines assisted in the creation and development of the content and format of the advertisements.

121.  Plaintiff's traffickers were required to pay a fee to Defendant Craigslist to allow the advertisements of the minor Plaintiff to be posted and displayed to millions of people on the hugely popular Craigslist classified advertising website.

122.  Plaintiff's advertisements would appear in Craigslist's classified advertising website in designated categories, such as "erotic services," "adult services," and later, "personal ads." Plaintiff's advertisements often included descriptors such as "curvy, caramel sweetheart" and "super sexy."

123.  Each advertisement of the Plaintiff L.H. included a nude or partially nude photograph of L.H. in a sexually suggestive position. All of these posts were submitted to Craigslist for posting on its website and none of these posts were rejected or removed. Instead, Defendant Craigslist indicated that it held the copyright to the advertisements and kept them posted with the marking "Copyright © 2009, craigslist, inc." with a link to its "Terms of Use" below the copyright.

124.  After reviewing L.H.'s Craigslist advertisements, buyers would often request additional pictures, and if the buyer chose to proceed, L.H. or her traffickers would provide the buyer with a phone number. The buyer would call the provided number and L.H. or her traffickers would direct the buyer to the hotel they were at. Once the buyer got to the hotel, he would call again for the room number.

125.  Oftentimes, when responding to one of Plaintiff's advertisements via the Craigslist internal

communication system, Plaintiff L.H. or her traffickers would indicate to buyers that she was an underage girl or a teenager (*i.e.*, communications indicating "I just turned 17," "I'm 16," or "I'm 17."). This did not stop Craigslist from approving advertisements listing the Plaintiff for sale on its website, nor did it stop buyers from arranging the purchase of the Plaintiff with her trafficker(s).

126.    Despite Craigslist's knowledge of the prolific criminal activity, including sex trafficking, occurring across its website, Craigslist did nothing to prevent or inhibit the rape, sale, purchase, and sex trafficking of Plaintiff L.H.

### E.  THE SEX TRAFFICKING OF L.H. AT DEFENDANT HOTELS

127.    The facts alleged herein stem from multiple sex trafficking rings operating in Miami, Florida.  While victimized by her traffickers in Florida, L.H. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendant Hotels' properties from 2008 to 2019.

128.    In 2008, at the age of fifteen years old, L.H. was being molested at home by her uncle.  She met her first trafficker online and he sold her as a teenage dream.  He convinced L.H. to drop out of school and run away with him because they were in love and would buy a house and make money together.  However, he had far more nefarious intentions.

129.    The trafficker coaxed L.H. into taking drugs and alcohol.  Once numb, he brought L.H. to Defendant Hotels and began her sexual exploitation alongside four or more other young co-victims.  L.H.'s trafficker repeatedly drugged L.H. and her co-victims to maintain control over them.

130.    The trafficker took L.H.'s identification card.  He also threatened L.H. that he knew where her family lived and he would hurt them if she did not do what he wanted.

131.    For years, the trafficker then sold L.H. for commercial sex at Defendant Hotels.

### a.   The Sex Trafficking of L.H. at the Marriott Stanton Hotel

132.    Plaintiff L.H. was first subjugated to sex trafficking at the Marriott Stanton Hotel, located at 161 Ocean Drive, Miami Beach, Florida 33139, in 2008 when she was fifteen years old.

133.    For approximately ten years, L.H.'s traffickers rented two adjoining rooms in the back of the Marriott Stanton Hotel.

134.    Upon information and belief, L.H.'s traffickers knew several of the front desk employees at the Marriott Stanton Hotel and had illicit arrangements with them to conceal their sex trafficking operation.  When the traffickers arrived in the lobby, they would always seek out the same specific employees for check-in.  At check-in, the Marriott Stanton Hotel's employees did not ask the traffickers for their identification and the traffickers were allowed to pay in cash.

135.    On many occasions, the Marriott Stanton Hotel employees would recognize L.H.'s traffickers upon arrival.  The employees would greet the traffickers and tell them that they had everything ready for them before the traffickers spoke.

136.    L.H. was one of four young girls that was simultaneously trafficked at the Marriott Stanton Hotel.  L.H. and the others were not allowed to speak during the check-in process or while in the lobby area.

137.    Neither L.H. nor the others were allowed to leave the room.  Instead, the traffickers would arrange buyers and bring them to the room.  As they would be kept in the Marriott Stanton Hotel for several days in a row, the traffickers would bring food for all of the girls to the room.

138.    The buyers would pay L.H.'s traffickers directly.  The traffickers would not give L.H. or her co-victims any money and claimed that it was payment for the room and their food.

139.    Each girl, including L.H., would be forced to perform commercial sex acts with up to 11-12 men a day.  Accordingly, the traffic and parade of men coming in and out of these Marriott Stanton Hotel rooms was tremendous.  Up to 11-12 buyers per day for four girls equals up to 48

sex buyers every day arriving at the Marriott Stanton Hotel rooms rented by the traffickers. This incredible procession and parade of men lasted almost continuously for a four-year period.

140.    L.H. was raped and otherwise sexually abused hundreds and hundreds of times at the Marriott Stanton Hotel.

141.    This procession of men would have been open and obvious to anyone working at the Stanton Marriott Hotel.  These sex buyers were not registered guests.

142.    The Marriott Stanton Hotel security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises.  No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor L.H. and her co-victims from occurring on the Marriott Stanton Hotel premises.

143.    There were numerous different Marriott Stanton Hotel employees involved in L.H.'s trafficker's operation.  Not only did the front desk employees check the traffickers in with "special privileges," these employees also served as lookouts for police and accepted money from the trafficker in exchange for allowing him to continue his trafficking operation at the Marriott Stanton Hotel. The traffickers would always pay employees in cash both before and after a night to continue this operation.

144.    In one instance, a Marriott Stanton Hotel employee came to the room where L.H. was trapped in regards to a complaint about how much traffic was coming in and out of the room.  L.H. opened the door.  The room was filled with remnants of the trafficking that L.H. and the other girls had endured, including drugs, alcohol, and sex paraphernalia.  The room had visible signs and smelled of recent drug use. L.H. was not clothed on top and was wearing only short shorts and a bra with makeup.  The employee looked at L.H. and asked how old she was.  L.H. replied, "I'm

not allowed to talk to you." The employee looked at the hotel room number and walked away. The employee never returned.

145. At yet a different time, a Marriott Stanton Hotel housekeeping employee came to the room where L.H. was trapped in regards to a complaint about loud noise disturbances in the room. Such noise complaints were routine because the buyers, and L.H. and her co-victims, would often fight with the trafficker.

146. On another occasion at the Marriott Stanton Hotel, L.H. saw her trafficker speaking to a manager behind the front desk. He later came by their room and spoke to L.H. However, despite the open and obvious signs of trafficking within the room, the Marriott Stanton Hotel manager offered no assistance to L.H. or the other captive girls.

147. Through hotel staff and employees, Defendant Marriott knew or should have known that L.H. was being trafficked for sex due to, but not limited to:

    a.   large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b.   payments for the rooms in cash;

    c.   L.H.'s physical appearance (malnourished, bruised, beaten, cigarette burns, drugged), and inappropriate attire;

    d.   a continuous procession of older men entering and leaving L.H.'s room;

    e.   excessive requests for sheets, cleaning supplies, and room service, which the Marriott Stanton Hotel personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids;

    f.   the personal relationship between the front desk employees, manager, and L.H.'s

traffickers; and,

g.  the direct employee encounters with L.H. and her traffickers inside the Marriott
Stanton Hotel rooms.

**b.  The Sex Trafficking of L.H. at the Hilton Bentley Hotel**

148.    Plaintiff L.H. was first subjugated to sex trafficking at the Hilton Bentley Hotel, located at
101 Ocean Drive, Miami Beach, Florida 33139, in 2008 when she was fifteen years old.

149.    For approximately ten years, L.H.'s traffickers rented two adjoining rooms in the back of
the Hilton Bentley Hotel.

150.    Upon information and belief, L.H.'s traffickers knew several of the front desk employees
at the Hilton Bentley Hotel and had illicit arrangements with them to conceal their sex trafficking
operation.  When the traffickers arrived in the lobby, they would always seek out the same specific
employees for check-in.  At check-in, the Hilton Bentley Hotel's employees did not ask the
traffickers for their identification and the traffickers were allowed to pay in cash.

151.    On many occasions, the Hilton Bentley Hotel employees would recognize L.H.'s
traffickers upon arrival.  The employees would greet the traffickers and tell them that they had
everything ready for them before the traffickers spoke.

152.    L.H. was one of four young girls that was simultaneously trafficked at the Hilton Bentley
Hotel.  L.H. and the others were not allowed to speak during the check-in process or while in the
lobby area.

153.    Neither L.H. nor the others were allowed to leave the room.  Instead, the traffickers would
arrange buyers and bring them to the room.  As they would be kept in the Hilton Bentley Hotel for
several days in a row, the traffickers would bring food for all of the girls to the room.

154.    The buyers would pay L.H.'s traffickers directly.  The traffickers would not give L.H. or
her co-victims any money and claimed that it was payment for the room and their food.

155.    Each girl, including L.H., would be forced to perform commercial sex acts with up to 13-14 men a day.  Accordingly, the traffic and parade of men coming in and out of these Hilton Bentley Hotel rooms was tremendous.  Up to 13-14 buyers per day for four girls equals up to 56 sex buyers every day arriving at the Hilton Bentley Hotel rooms rented by the traffickers. This incredible procession and parade of men lasted almost continuously for a four-year period.

156.    L.H. was raped and otherwise sexually abused hundreds and hundreds of times at the Hilton Bentley Hotel.

157.    This procession of men would have been open and obvious to anyone working at the Hilton Bentley Hotel.  These sex buyers were not registered guests.

158.    The Hilton Bentley Hotel security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises.  No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor L.H. and her co-victims from occurring on the Hilton Bentley Hotel premises.

159.    There were numerous different Hilton Bentley Hotel employees involved in L.H.'s trafficker's operation.  Not only did the front desk employees check the traffickers in with "special privileges," these employees also served as lookouts for police and accepted money from the traffickers in exchange for allowing them to continue their trafficking operation at the Hilton Bentley Hotel. The traffickers would always pay employees in cash both before and after a night to continue this operation.

160.    In addition, two Hilton Bentley Hotel male employees paid L.H.'s trafficker for sex from L.H. and one of her co-victims.  These employee buyers came to the room where L.H. was trafficked in the Hilton Bentley Hotel, and L.H. and her co-victim were forced to perform sexual

acts upon them.  L.H. knew these males worked for the Hilton Bentley Hotel because they arrived at the room wearing their uniforms.

161.    The Hilton Bentley Hotel housekeeping personnel would also automatically replenish and provide additional linens to the room several times throughout the day.

162.    Through hotel staff and employees, Defendant Marriott knew or should have known that L.H. was being trafficked for sex due to, but not limited to:

    a.  large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b.  payments for the rooms in cash;

    c.  L.H.'s physical appearance (malnourished, bruised, beaten, cigarette burns, drugged), and inappropriate attire;

    d.  a continuous procession of older men entering and leaving L.H.'s room;

    e.  automatic replenishing of linens several times throughout the day by the Hilton Bentley Hotel housekeeping personnel, combined with additional requests for sheets, cleaning supplies, and room service, which the Hilton Bentley Hotel personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids;

    f.  the personal relationship between the front desk employees, manager, and L.H.'s traffickers; and,

    g.  the direct employee encounters with L.H. and her traffickers inside the Hilton Bentley Hotel rooms.

    **c.  The Sex Trafficking of L.H. at the Hilton Miami Downtown**

163.    Plaintiff L.H. was first subjugated to sex trafficking at the Hilton Miami Downtown Hotel,

located at 1601 Briscayne Boulevard, Miami, Florida 33132, in 2008 when she was fifteen years old.

164. For approximately ten years, L.H.'s traffickers rented the same room in the back corner of the Hilton Miami Downtown.

165. Upon information and belief, L.H.'s traffickers knew several of the front desk employees at the Hilton Miami Downtown and had illicit arrangements with them to conceal their sex trafficking operation.  When the traffickers arrived in the lobby, they would always seek out the same specific employees for check-in.  At check-in, the Hilton Miami Downtown's employees did not ask the traffickers for their identification and the traffickers were allowed to pay in cash.

166. On many occasions, the Hilton Miami Downtown employees would recognize L.H.'s traffickers upon arrival.  The employees would greet the traffickers and tell him that they had everything ready for him before the trafficker spoke.

167. L.H. was one of four young girls that was simultaneously trafficked at the Hilton Miami Downtown.  L.H. and the others were not allowed to speak during the check-in process or while in the lobby area.

168. Neither L.H. nor the others were allowed to leave the room.  Instead, the traffickers would arrange buyers and bring them to the room.  As they would be kept in the Hilton Miami Downtown for several days in a row, the traffickers would bring food for all of the girls to the room.

169. The buyers would pay L.H.'s traffickers directly.  The traffickers would not give L.H. or her co-victims any money and claimed that it was payment for the room and their food.

170. L.H.'s traffickers brought L.H. and her co-victims to the Hilton Miami Downtown

approximately once a week for two nights at a time, for a total of at least 500 stays where each girl, including L.H., would be forced to perform commercial sex acts with buyers throughout the day.  Accordingly, the traffic and parade of men coming in and out of the Hilton Miami Downtown room was tremendous.  This incredible procession and parade of men lasted almost continuously for a four-year period.

171.   L.H. was raped and otherwise sexually abused hundreds and hundreds of times at the Hilton Miami Downtown.

172.   This procession of men would have been open and obvious to anyone working at the Hilton Miami Downtown.  These sex buyers were not registered guests.

173.   The Hilton Miami Downtown security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises.  No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor L.H. and her co-victims from occurring on the Hilton Miami Downtown premises.

174.   There were numerous different Hilton Miami Downtown employees involved in L.H.'s trafficker's operation.  Not only did the front desk employees check the traffickers in with "special privileges," these employees also served as lookouts for police and accepted money from the traffickers in exchange for allowing him to continue their trafficking operation at the Hilton Miami Downtown. The traffickers would always pay employees in cash both before and after a night to continue this operation.

175.   In addition, L.H.'s trafficker was arrested for trafficking and strangling one of L.H.'s co-victims while at the Hilton Miami Downtown.

176.   Through hotel staff and employees, Defendant Hilton knew or should have known that

L.H. was being trafficked for sex due to, but not limited to:

    a.  large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b.  payments for the rooms in cash;

    c.  L.H.'s physical appearance (malnourished, bruised, beaten, cigarette burns, drugged), and inappropriate attire;

    d.  a continuous procession of older men entering and leaving L.H.'s room;

    e.  excessive requests for sheets, cleaning supplies, and room service, which the Hilton Miami Downtown personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids;

    f.  the personal relationship between the front desk employees, manager, and L.H.'s traffickers; and,

    g.  the direct employee encounters with L.H. and her traffickers inside the Hilton Miami Downtown rooms.

### d. The Sex Trafficking of L.H. at the Hilton Garden Inn Miami South Beach

177.  Plaintiff L.H. was first subjugated to sex trafficking at the Hilton Garden Inn, located at 2940 Collins Avenue, Miami Beach, Florida 33140, in 2008 when she was fifteen years old.

178.  For approximately ten years, L.H.'s traffickers routinely rented rooms at the Hilton Garden Inn for the purposes of selling L.H. and her co-victims for sex.

179.  Upon information and belief, L.H.'s trafficker knew several of the front desk employees at the Hilton Garden Inn and had illicit arrangements with them to conceal their sex trafficking operation.  When the traffickers arrived in the lobby, they would always seek

out the same specific employees for check-in.   At check-in, the Hilton Garden Inn's employees did not ask the traffickers for their identification and the traffickers were allowed to pay in cash.

180.   On many occasions, the Hilton Garden Inn employees would recognize L.H.'s traffickers upon arrival.   The employees would greet her traffickers and tell them that they had everything ready for them before the traffickers spoke.

181.   L.H. was one of four young girls that was simultaneously trafficked at the Hilton Garden Inn.   L.H. and the others were not allowed to speak during the check-in process or while in the lobby area.

182.   Neither L.H. nor the others were allowed to leave the room.   Instead, the traffickers would arrange buyers and bring them to the room.   As they would be kept in the Hilton Garden Inn for several days in a row, the traffickers would bring food for all of the girls to the room.

183.   The buyers would pay L.H.'s traffickers directly.   The traffickers would not give L.H. or her co-victims any money and claimed that it was payment for the room and their food.

184.   L.H.'s traffickers brought L.H. and her co-victims to the Hilton Garden Inn for three to four night stays where each girl, including L.H., would be forced to perform commercial sex acts with buyers throughout the day.   Accordingly, the traffic and parade of men coming in and out of the Hilton Miami Downtown room was tremendous.   This incredible procession and parade of men lasted almost continuously for a four-year period.

185.   L.H. was raped and otherwise sexually abused hundreds and hundreds of times at the Hilton Garden Inn.

186.   This procession of men would have been open and obvious to anyone working at the Hilton

Garden Inn.  These sex buyers were not registered guests.

187.   The Hilton Garden Inn security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises.  No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor L.H. and her co-victims from occurring on the Hilton Garden Inn premises.

188.   There were numerous different Hilton Garden Inn employees involved in L.H.'s trafficker's operation.  Not only did the front desk employees check the traffickers in with "special privileges," these employees also served as lookouts for police and accepted money from the traffickers in exchange for allowing them to continue their trafficking operation at the Hilton Garden Inn. The traffickers would always pay employees in cash both before and after a night to continue this operation.

189.   In addition, Hilton Garden Inn hotel staff would regularly and automatically bring new linens to the room a few times daily when they saw a buyer leave the room where L.H. and her co-victims were trafficked.  At times, L.H.'s traffickers would also call and request additional linens be brought to the room.

190.   Through hotel staff and employees, Defendant Hilton knew or should have known that L.H. was being trafficked for sex due to, but not limited to:

   a.   large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

   b.   payments for the rooms in cash;

   c.   L.H.'s physical appearance (malnourished, bruised, beaten, cigarette burns, drugged), and inappropriate attire;

    d.  a continuous procession of older men entering and leaving L.H.'s room;

    e.  excessive requests for sheets, cleaning supplies, and room service, which the Hilton Garden Inn personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids;

    f.  the personal relationship between the front desk employees, manager, and L.H.'s traffickers; and,

    g.  the direct employee encounters with L.H. and her traffickers inside the Hilton Garden Inn rooms.

### e.  The Sex Trafficking of L.H. at the Hilton Embassy Suites Miami Airport

191.  Plaintiff L.H. was first subjugated to sex trafficking at the Hilton Embassy Suites, located at 3974 NW South River Drive, Miami, Florida 33142, in 2008 when she was fifteen years old.

192.  For approximately ten years, L.H.'s traffickers routinely rented rooms at the Hilton Embassy Suites for the purposes of selling L.H. and her co-victims for sex. The traffickers often asked for a nice suite on the backside of the hotel.

193.  Upon information and belief, L.H.'s traffickers knew several of the front desk employees at the Hilton Embassy Suites and had illicit arrangements with them to conceal their sex trafficking operation.  When the traffickers arrived in the lobby, they would always seek out the same specific employees for check-in.  At check-in, the Hilton Embassy Suites employees did not ask the traffickers for their identification and the traffickers were allowed to pay in cash.

194.  On many occasions, the Hilton Embassy Suites employees would recognize L.H.'s traffickers upon arrival.  The employees would greet the traffickers and tell them that they

had everything ready for them before the traffickers spoke.

195.    L.H. was one of four young girls that was simultaneously trafficked at the Hilton Embassy Suites.  L.H. and the others were not allowed to speak during the check-in process or while in the lobby area.

196.    Neither L.H. nor the others were allowed to leave the room.  Instead, the traffickers would arrange buyers and bring them to the room.  As they would be kept in the Hilton Embassy Suites for several days in a row, the traffickers would bring food for all of the girls to the room.

197.    The buyers would pay L.H.'s traffickers directly.  The traffickers would not give L.H. or her co-victims any money and claimed that it was payment for the room and their food.

198.    Each girl, including L.H., would be forced to perform commercial sex acts with up to 13-14 men a day.  Accordingly, the traffic and parade of men coming in and out of these Hilton Embassy Suites rooms was tremendous.  Up to 13-14 buyers per day for four girls equals up to 56 sex buyers every day arriving at the Hilton Embassy Suites rooms rented by the traffickers. This incredible procession and parade of men lasted almost continuously for a four-year period.

199.    L.H. was raped and otherwise sexually abused hundreds and hundreds of times at the Hilton Embassy Suites.

200.    This procession of men would have been open and obvious to anyone working at the Hilton Embassy Suites.  These sex buyers were not registered guests.

201.    The Hilton Embassy Suites security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises.  No one at the corporate level apparently ever utilized their alleged mandated surveillance and

security to prevent the flagrant sex trafficking of the minor L.H. and her co-victims from occurring on the Hilton Embassy Suites premises.

202.   There were numerous different Hilton Embassy Suites employees involved in L.H.'s trafficker's operation.  Not only did the front desk employees check the trafficker in with "special privileges," these employees also served as lookouts for police and accepted money from the trafficker in exchange for allowing him to continue his trafficking operation at the Hilton Embassy Suites. The trafficker would always pay employees in cash both before and after a night to continue this operation.

203.   In one instance, a Hilton Embassy Suites housekeeper walked in while L.H. was being trafficked for three different buyers at the same time.  The housekeeper made eye contact with L.H. but left without helping her.  The room was filled with remnants of the trafficking that L.H. and the other girls had endured, including drugs, alcohol, and sex paraphernalia.  The room had visible signs and smelled of recent drug use.  The housekeeper did not return to the room.

204.   Through hotel staff and employees, Defendant Hilton knew or should have known that L.H. was being trafficked for sex due to, but not limited to:

   a.   large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

   b.   payments for the rooms in cash;

   c.   L.H.'s physical appearance (malnourished, bruised, beaten, cigarette burns, drugged), and inappropriate attire;

   d.   a continuous procession of older men entering and leaving L.H.'s room;

   e.   excessive requests for sheets, cleaning supplies, and room service, which the Hilton

Embassy Suites personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids;

f.  the personal relationship between the front desk employees, manager, and L.H.'s traffickers; and,

g.  the direct employee encounters with L.H. and her traffickers inside the Hilton Embassy Suites.

**f.  The Sex Trafficking of L.H. at Motel 6 Miami Beach**

205.  Plaintiff L.H. was first subjugated to sex trafficking at the Motel 6, located at 7330 NW 36th Street, Miami, Florida 33166, in 2008 when she was fifteen years old.

206.  For approximately ten years, L.H.'s traffickers rented a room in the back of the Motel 6.

207.  Upon information and belief, L.H.'s traffickers knew several of the front desk employees at the Motel 6 and had illicit arrangements with them to conceal their sex trafficking operation.  When the traffickers arrived in the lobby, they would always seek out the same specific employees for check-in.  At check-in, the Motel 6's employees did not ask the traffickers for their identification and the traffickers were allowed to pay in cash.

208.  L.H.'s traffickers paid for the room on a daily basis in cash.

209.  On many occasions, the Motel 6 employees would recognize L.H.'s traffickers upon arrival.  The employees would greet the traffickers and tell them that they had everything ready for them before the traffickers spoke.

210.  L.H. witnessed and overheard her traffickers having personal conversations with the Motel 6 front desk clerks.

211.  L.H. was one of four young girls that was simultaneously trafficked at the Motel 6.  L.H. and the others were not allowed to speak during the check-in process or while in the lobby

area.

212. Neither L.H. nor the others were allowed to leave the room. Instead, the trafficker would arrange buyers and bring them to the room. As they would be kept in the Motel 6 for several days in a row, the traffickers would bring food for all of the girls to the room.

213. The buyers would pay L.H.'s trafficker directly. The trafficker would not give L.H. or her co-victims any money and claimed that it was payment for the room and their food.

214. Each girl, including L.H., would be forced to perform commercial sex acts with up to 13-14 men a day. Accordingly, the traffic and parade of men coming in and out of these Motel 6 rooms was tremendous. Up to 13-14 buyers per day for four girls equals up to 56 sex buyers every day arriving at the Motel 6 rooms rented by the traffickers. This incredible procession and parade of men lasted almost continuously for a four-year period.

215. L.H. was raped and otherwise sexually abused hundreds and hundreds of times at the Motel 6.

216. This procession of men would have been open and obvious to anyone working at the Motel 6. These sex buyers were not registered guests.

217. The Motel 6 security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor L.H. and her co-victims from occurring on the Motel 6 premises.

218. There were numerous different Motel 6 employees involved in L.H.'s trafficker's operation. Not only did the front desk employees check the trafficker in with "special privileges," these employees also served as lookouts for police and accepted money from

the trafficker in exchange for allowing him to continue his trafficking operation at the Motel 6. The traffickers would always pay employees in cash both before and after a night to continue this operation.

219. Through hotel staff and employees, Defendant G6 knew or should have known that L.H. was being trafficked for sex due to, but not limited to:

    a. large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b. payments for the rooms in cash;

    c. L.H.'s physical appearance (malnourished, bruised, beaten, cigarette burns, drugged), and inappropriate attire;

    d. a continuous procession of older men entering and leaving L.H.'s room;

    e. excessive requests for sheets, cleaning supplies, and room service, which the Motel 6 personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids;

    f. the personal relationship between the front desk employees, manager, and L.H.'s traffickers; and,

    g. the direct employee encounters with L.H. and her traffickers inside the Motel 6 rooms.

    **g. The Sex Trafficking of L.H. Holiday Inn Miami North I-95, an IHG Hotel**

220. Plaintiff L.H. was first subjugated to sex trafficking at the Holiday Inn Miami, located at 7927 NW 7th Avenue, Miami, Florida 33150, in 2008 when she was fifteen years old.

221. For approximately ten years, L.H.'s traffickers requested a room rental upstairs or in the furthest back of the Holiday Inn Miami.

222.   Upon information and belief, L.H.'s traffickers knew several of the front desk employees at the Holiday Inn Miami and had illicit arrangements with them to conceal his sex trafficking operation.  When the traffickers arrived in the lobby, they would always seek out the same specific employees for check-in.  At check-in, the Holiday Inn Miami's employees did not ask the traffickers for their identification and the traffickers were allowed to pay in cash.

223.   On many occasions, the Holiday Inn Miami employees would recognize L.H.'s traffickers upon arrival.  The employees would greet the traffickers and tell them that they had everything ready for them before the traffickers spoke.

224.   L.H. was one of four young girls that was simultaneously trafficked at the Holiday Inn Miami.  L.H. and the others were not allowed to speak during the check-in process or while in the lobby area.

225.   Neither L.H. nor the others were allowed to leave the room.  Instead, the traffickers would arrange buyers and bring them to the room.  As they would be kept in the Holiday Inn Miami for several days in a row, the trafficker would bring food for all of the girls to the room.

226.   The buyers would pay L.H.'s traffickers directly.  The traffickers would not give L.H. or her co-victims any money and claimed that it was payment for the room and their food.

227.   Each girl, including L.H., would be forced to perform commercial sex acts with up to 11-12 men a day.  Accordingly, the traffic and parade of men coming in and out of these Holiday Inn Miami rooms was tremendous.  Up to 11-12 buyers per day for four girls equals up to 48 sex buyers every day arriving at the Holiday Inn Miami rooms rented by the traffickers. This incredible procession and parade of men lasted almost continuously

for a four-year period.

228.   L.H. was raped and otherwise sexually abused hundreds and hundreds of times at the Holiday Inn Miami.

229.   This procession of men would have been open and obvious to anyone working at the Holiday Inn Miami.  These sex buyers were not registered guests.

230.   The Holiday Inn Miami security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises.  No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor L.H. and her co-victims from occurring on the Holiday Inn Miami premises.

231.   There were numerous different Holiday Inn Miami employees involved in L.H.'s trafficker's operation.  Not only did the front desk employees check the traffickers in with "special privileges," these employees also served as lookouts for police and accepted money from the trafficker in exchange for allowing him to continue his trafficking operation at the Holiday Inn Miami. The traffickers would always pay employees in cash both before and after a night to continue this operation.

232.   While L.H.'s traffickers asked housekeeping to stay out of the rooms, they constantly asked hotel staff for new sheets and towels as buyers entered and exited the room every few minutes.

233.   In addition, in one instance, the police came to their hotel room at the Holiday Inn Miami when L.H.'s trafficker was physically assaulting L.H.  Upon information and belief, a nearby guest heard L.H. being brutally attacked and called for law enforcement.

234.   Through hotel staff and employees, Defendant IHG knew or should have known that L.H.

was being trafficked for sex due to, but not limited to:

a. large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

b. payments for the rooms in cash;

c. L.H.'s physical appearance (malnourished, bruised, beaten, cigarette burns, drugged), and inappropriate attire;

d. a continuous procession of older men entering and leaving L.H.'s room;

e. excessive requests for sheets, cleaning supplies, and room service, which the Holiday Inn Miami personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids;

f. the personal relationship between the front desk employees, manager, and L.H.'s traffickers; and,

g. the direct employee encounters with L.H. and her traffickers inside the Holiday Inn Miami.

## F.  HOTEL DEFENDANTS FACILITATED THE TRAFFICKING OF L.H.

235. Defendant Hotels, Marriott and Hilton, profited from the sex trafficking of L.H. and knowingly or negligently aided and engaged with her trafficker in a sex trafficking venture. The Defendants leased rooms to L.H.'s traffickers when they knew, or should have known, that her trafficker was using their rooms to subject L.H. to repeated exploitation as he forced her into sexual servitude.

236. Defendant Hotels knew, or should have known, that L.H. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because L.H.'s trafficker frequented the Defendants' hotels.

237.    Defendant Hotels knew, or should have known, that L.H. was being trafficked because L.H. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotels for his illegal sex trafficking venture. 130. Defendant Hotels actively participated in this illegal endeavor by knowingly or negligently providing lodging in which to harbor L.H. while he was trafficking her.

238.    Defendant Hotels profited from the sex trafficking of L.H. and knowingly or negligently aided and participated with L.H.'s trafficker in his criminal venture.  The Defendants took no action as L.H. repeatedly visited the hotel, often with different guests, avoiding all eye contact, and exhibiting signs of malnourishment and physical abuse.

239.    The Defendant Hotels all had the opportunity to stop L.H.'s traffickers and offenders like them from victimizing L.H. and others like her.  Instead, each Hotel Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

240.    The Defendant Hotels all financially benefited from the sex trafficking of L.H., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

241.    Defendant Hotels enjoy the steady stream of income that sex traffickers bring to their hotel brands, such as the Marriott Stanton Hotel and the Hilton Bentley Hotel.

242.    Defendant Hotels financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

243.    Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect L.H., including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted

access.  By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

244.    Defendant Hotels failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

245.    Defendant Hotels maintained their deficiencies to maximize profits by:

a.  Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b.  Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity

measures to actively combat human trafficking and sexual exploitation.

246.    As a direct and proximate result of these egregious practices on the part of the Defendant

Hotels, L.H. and victims of sex trafficking and exploitation like her, have been permanently injured

and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**
**COUNT ONE – 18 U. S. C. § 1595 ("TVPRA")**
**(Against All Defendants)**

247.    The Plaintiff L.H. incorporates each foregoing allegation.

248.    L.H. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is

therefore entitled to bring a civil action under 18 U.S.C. § 1595.

249.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined

above, constitute a violation of 18 U.S.C. § 1595.  Specifically, Defendants had a statutory

obligation not to benefit from a venture that they knew, or should have known, to engage in

violations of 18 U.S.C. § 1591(a).  At all relevant times, Defendants breached this duty by

participating in, and facilitating, the harboring and providing of L.H. for the purposes of

commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions,

both when Plaintiff L.H. was a minor and when Plaintiff L.H. was an adult.

250.    All Defendants have benefited as a result of their acts, omissions, and/or commissions by

keeping operating costs low, and maintaining the loyalty of the segment of their customer base

that seeks to participate in the sex trade.  Defendant Craigslist knowingly and directly benefited

from the sex trafficking of Plaintiff on each occasion they received payment for advertisements

selling Plaintiff L.H. for commercial sex on its website. Moreover, Defendant Hotels directly

benefited from the trafficking of L.H. on each occasion they received payment for rooms that she

was being kept in at Defendants' hotels.  The actions, omissions, and/or commissions alleged in

this pleading were the but-for and proximate cause of L.H.'s injuries and damages.

251.    L.H. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited on Defendant Craigslist's website and at the Defendants' hotels and properties in violation of 18 U.S.C. § 1591(a).

### PRAYER OF RELIEF

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it awards damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a.   All available compensatory damages for the described losses with respect to each cause of action;

b.   past and future medical expenses, as well as the costs associated with past and future life care;

c.   past and future lost wages and loss of earning capacity;

d.   past and future emotional distress;

e.   consequential and/or special damages;

f.   all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.   disgorgement of profits obtained through unjust enrichment;

h.   restitution;

i.   punitive damages with respect to each cause of action;

j.   reasonable and recoverable attorneys' fees;

k.   costs of this action; and

l.   pre-judgment and all other interest recoverable.

Also, on the basis of the foregoing, Plaintiff requests that a jury be selected to hear this case and render a verdict for Plaintiff, and against Defendants, and that it awards damages to Plaintiff in an amount which adequately reflects the enormity of Defendants' wrongs, and which will effectively prevent other similarly caused acts.  Further, Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deem appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 9, 2021                                 Respectfully submitted,

/s/ Kimberly L. Adams
Kimberly L. Adams (Fl. Bar No. 0014479)
kadams@levinlaw.com
Kathryn L. Avila (Fl. Bar No. 1019574)
kavila@levinlaw.com
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 436-6246
Facsimile: (850) 436-6271

/s/ Erik L. Bauer
Erik L. Bauer (*Pro Hac Vice Pending*)
erik@erikbauerlaw.com
Susanna L. Southworth (*Pro Hac Vice Pending*)
susanna@erikbauerlaw.com
**The Law Office of Erik L. Bauer**
215 Tacoma Avenue South
Tacoma, Washington 98402
Phone: (253) 383-2000
Fax: (253) 383-0154

/s/ Brian J. Perkins
Brian J. Perkins (*Pro Hac Vice Pending)*
Email: bperkins@levinsimes.com

112

Amanda J.G. Walbrun (*Pro Hac Vice Pending)*
Email: awalbrun@levinsimes.com
**LEVIN SIMES ABRAMS LLP**
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001

*Attorneys for Plaintiff*

## **EXHIBIT 1**

The Wayback Machine - https://web.archive.org/web/20041206013404/http://post.craigslist.org:80/mia/P?ptype=ersAgree
**Posting a personals listing on miami, florida craigslist**

### PLEASE OBSERVE THE FOLLOWING GUIDELINES IN EROTIC SERVICES

1. **Erotic Services is intended only for LEGAL services such as escorts, sensual massage, and erotic dance.**
   **Please do NOT suggest or imply an illegal exchange of sexual favors for money!** When posting, you agree to abide by the craigslist Terms of Use, which forbid you to post, email, or otherwise make available content that is unlawful, obscene, or which advertises illegal services. *Postings that make reference to specific body parts or sex acts -- including code words like "greek" and "bbbj" -- are subject to removal and other remedial action.*

2. **Please work out the details of escort or companionship arrangements offsite.**
   Each posting has an email address and/or phone number for this purpose.

3. **please do NOT include any obscene images with your posting**
   If you're not sure whether a particular image is obscene, please do not post it.

If you are unable to follow these guidelines for "erotic services", please do not post on craigslist. Postings outside these guidelines are subject to removal, and posters of such postings are subject to blocking.

craigslist may supply information about your identity to law enforcement officers in response to legal subpoena.

| I have read these guidelines and will abide by them - proceed with erotic services posting |
|---|