United States District Court
for the
Southern District of Florida

| | |
|---|---|
| L.H., Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 21-22894-Civ-Scola |
| | ) |
| Marriott International, Inc., and others, Defendants. | ) |

**Omnibus Order Granting Motions to Dismiss**

In this case, Plaintiff L.H.[1] alleges she was trafficked for commercial sex for over a decade, beginning when she was fifteen-years old, in 2008. (2nd Am. Compl. ("Compl." or "complaint"), ECF No. 37.) She maintains that Defendants Marriott International, Inc.; Hilton Worldwide Holdings, Inc.; Hilton Domestic Operating Company Inc. (the two Hilton companies, together, "the Hilton Companies"); G6 Hospitality, LLC; and craigslist, Inc., should all be held responsible, under the Trafficking Victims Protection Reauthorization Act, for their role in her exploitation and brutalization. In response, Marriott International; the Hilton Companies; and G6 Hospitality seek dismissal of L.H.'s complaint, arguing, among other things, that L.H. has failed to state a claim for either their direct or their vicarious liability under the TVPRA. (Marriott's Mot., ECF No. 46; Hilton Cos. & G6's Mot., ECF No. 68.) Separately, Hilton Worldwide submits the Court lacks personal jurisdiction over it. (Hilton Cos. and G6's Mot. at 28–31.) craigslist, on the other hand, maintains, primarily, that it is immune under § 230 of the Communications Decency Act. (craigslist's Mot., ECF No. 48.) L.H. has opposed the motions (Pl.'s Resp. to the Hotel Cos., ECF No. 85; Pl.'s Resp. to craigslist, ECF No. 84) and the Defendants have all timely replied. (Marriott's Reply, ECF No. 90; Hilton Cos. & G6's Reply, ECF No. 89; craigslist's Reply, ECF No. 91.) After careful review, the Court agrees with the Defendants and therefore **grants** their motions (**ECF Nos. 46, 48, 68**) and, for the following reasons, **dismisses** L.H.'s case against **Marriott International, Hilton Domestic, and G6 Hospitality** (together, the "Hotel Companies") **with prejudice**, for a failure to state a claim; against **Hilton Worldwide**, **without prejudice**, based on a lack of personal jurisdiction; and against **craigslist**, **with prejudice**, based on its immunity under § 230 of the CDA.

---

[1] Based on the sensitive nature of the subject matter underlying L.H.'s allegations, and upon the parties' agreement, the Court has permitted the Plaintiff to proceed pseudonymously as "L.H." (*See, e.g.*, Prot. Order, ECF No. 98, 2 (Goodman, Mag. J.).)

### 1. Background[2]

Beginning in 2008, when L.H. was fifteen, two men brutally orchestrated trafficking her for commercial sex over the next ten years. (*E.g.*, Compl. ¶ 132.) She was regularly held for purchase at hotels throughout Miami-Dade County. (*Id.* ¶ 8.) Among those hotels are the Marriot Stanton South Beach Hotel, the Hilton Bentley Hotel, the Hilton Miami Downtown, the Hilton Garden Inn Miami South Beach, the Embassy Suites by Hilton Miami International Airport, and the Motel 6 Miami Beach (the "Miami Hotels"). (*Id.*)

Marriot International (through its relationship with the Marriot Stanton South Beach Hotel) and the Hilton Companies (through their relationships with the Hilton Bentley Hotel, the Hilton Miami Downtown, the Hilton Garden Inn Miami South Beach, and the Embassy Suites by Hilton Miami International Airport) both require compliance with certain policies: the use of Marriott or Hilton signs; providing Marriott or Hilton branded stationery; using the Marriott or Hilton website and the mandated 1-800 number for reservations; and the implementation of the Marriott or Hilton guest-rewards programs. (*Id.* ¶¶ 86.j; 87.j.) Marriot International, the Hilton Companies, and G6 Hospitality (in relation to the Motel 6 at 7330 NW 36th Street in Miami, Florida), also mandate that their hotels carry a certain level of Wi-Fi internet access for guests and require certain cybersecurity measures. (*Id.* ¶¶ 86.l.–m; 87.m–n; 88.m–n.)

Marriot International, the Hilton Companies, and G6 Hospitality could, and in some cases did, track and control data regarding guest preferences or information: for example, guests' physical locations, guests' internet activity, and room inventory information. (*Id.* ¶¶ 86.i.; 87.i.; 88.i.) Among the assortment of other data that the Defendant hotels' privacy policies reveal they collect about guests at their branded hotels are government identification information; nationalities; addresses; telephone numbers; email addresses; payment data; birth dates and places; accompanying guests; loyalty-program membership information; social-media account information; purchase histories and tendencies; biometric data; vehicle information; images and footage from hotel cameras; technological data including browser and device information; and downloading and internet access data. (*Id.* ¶¶ 86.n.; 87.o; 88.o.) Based on the list of information L.H. says Marriott International, the Hilton Companies, and G6 Hospitality have access to, the companies could have all readily detected that rooms at their respectively associated hotels were being used to sex traffic L.H.

---

[2] This background is based on the allegations the Plaintiff presents in her complaint. For the purposes of evaluating the Defendants' motions, the Court accepts the Plaintiff's factual allegations as true and construes the allegations in the light most favorable to her per Federal Rule of Civil Procedure 12(b)(6).

(*E.g., id.* ¶¶ 86.v.; 87.w.; 88.z.) Additionally, L.H. identifies numerous published accounts, through news media or hotel reviews, of prostitution, sex trafficking, or related crimes or incidents at various Marriot, Hilton, or G6 Hospitality branded properties throughout the world. (*Id.* ¶¶ 86.y.–z.; 87.z.–aa.; 88.dd.)

Beginning in 2008, when L.H. was fifteen, until 2019, L.H. was continually brutalized by her sex traffickers who sold her, along with three other young girls or women, for commercial sex. (*Id.* ¶¶ 126–30.) The traffickers ran their sex-trafficking operations out of the Miami Hotels over the course of ten years, often renting adjoining rooms, usually towards the back of the properties. (*E.g., id.* ¶¶ 131–132.) The traffickers personally knew several front-desk employees at the Miami Hotels and those employees, in exchange for compensation, helped facilitate and conceal the sex-trafficking operations. (*E.g., id.* ¶¶ 133, 142.) The employees never asked the traffickers for their identification and allowed them to pay in cash. (*E.g., id.* ¶ 133.) L.H. and the other victims were not permitted to speak during the check-in process, or while in the lobby, and were frequently confined to the rooms for several days at a time. (*E.g., id.* ¶¶ 135–36.) L.H. and the other victims would be forced to perform commercial sex acts for between eleven and fourteen different men daily—resulting in an obvious of parade of sex buyers into and out of the Miami Hotels each day. (*E.g., id.* ¶¶ 138, 154.)

L.H. and the other victims had notable interactions with the employees at the various Miami Hotels. For example, a Marriot Stanton employee came to the room where L.H. was being held, in response to a complaint about the constant traffic into and out of the room. (*Id.* ¶ 143.) When L.H. opened the door, the employee was able to see drugs, alcohol, sex paraphernalia, and that L.H., wearing makeup, was clad only in a bra and short shorts. (*Id.*) When the employee asked L.H. how old she was, she told the employee that she was not allowed to speak to anyone. (*Id.*) At another hotel, the Hilton Bentley, two employees, in uniform, even paid the traffickers to have sex with L.H. and one of the other victims. (*Id.* ¶ 159.) Additionally, employees at the Hilton Miami Downtown witnessed one of L.H.'s trafficker's being arrested for trafficking and strangling one of the other victims. (*Id.* ¶ 174.) Further, on yet another occasion, a Hilton Embassy Suites housekeeper walked into the room while L.H. was being trafficked for three different buyers, simultaneously. (*Id.* ¶ 202.) The housekeeper made eye contact with L.H., had to have seen the drugs, alcohol, and sex paraphernalia in the room, but simply left, without offering L.H. any aid. (*Id.*) In general, many of the Miami Hotel employees would have been able to readily observe large amounts of used condoms, empty lube bottles, lingerie, sex toys, and linens stained with bodily fluids. (*E.g., id.* ¶ 146.a.) They also would have seen that L.H. was malnourished, bruised, covered in burn marks from cigarettes, drugged, and inappropriately attired. (*E.g., id.*) They would have also

noticed excessive requests for new sheets and towels, cleaning supplies, and room service. (*E.g., id.* ¶ 146.e.)

L.H.'s traffickers also used craigslist's website platform to advertise to potential buyers and to arrange for meetings, for commercial sex acts, using craigslist's internal messaging system. (*Id.* ¶ 8.) Her traffickers would use thinly coded language on postings to get around craigslist's published policy against posts' offering sex acts for money. (*Id.* ¶ 94.) They also used craigslist's categories "erotic services," "adult services," "massage services," "casual encounters," and "personals" to display their posts. (*Id.* ¶¶ 100, 113, 115.) Through the website, craigslist's internal email system allowed traffickers and sex buyers alike to remain anonymous and hidden while negotiating sales. (*Id.* ¶ 102.) Despite craigslist's purported terms-of-use policies and guidelines, L.H's traffickers posted sexually explicit, nude, and partially nude photographs of her, combined with coded wording, to advertise L.H. for commercial sex. (*Id.* ¶ 119.) In order to do so, the traffickers also paid a fee to craigslist. (*Id.* ¶ 120.) None of L.H.'s traffickers' explicit posts were ever rejected or removed. (*Id.* ¶ 122.) Instead, craigslist would mark the postings as copyrighted, with a link to its "Terms of Use." (*Id.*) L.H. and her traffickers, using craigslist's internal messaging system, would sometimes inform interested buyers that she was underage. (*Id.* ¶ 124.)

### 2. Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all the complaint's factual allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A pleading must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). "A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Federal Rule of Civil Procedure 12(b)(2) governs motions to dismiss for lack of personal jurisdiction. "A court must dismiss an action against a defendant over which it has no personal jurisdiction." *Verizon Trademark Servs., LLC v. Producers, Inc.*, 810 F. Supp. 2d 1321, 1323-24 (M.D. Fla. 2011). To withstand a motion to dismiss, the plaintiff must plead sufficient facts to establish a prima facie case of jurisdiction over the non-resident defendants. *Virgin Health Corp. v. Virgin Enters. Ltd.*, 393 F. App'x 623, 625 (11th Cir. 2010). The court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendants' affidavits. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). If the defendants sustain their burden of challenging the plaintiff's allegations through affidavits or other competent evidence, the plaintiff must substantiate the jurisdictional allegations in the complaint by affidavits, testimony, or other evidence of its own. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). The plaintiff must do more than "merely reiterate the factual allegations in the complaint." *Id.* (quoting *Prentice v. Prentice Colour, Inc.*, 779 F. Supp. 578, 583 (M.D. Fla. 1991)). Where the evidence conflicts, however, the district court must construe all reasonable inferences in favor of the plaintiff. *See PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010).

### 3. Discussion

As provided for under the TVPRA, a sex-trafficking victim may not only sue a sex-trafficking perpetrator, for civil liability through a private right of action, but may also seek to hold liable "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]." 18 U.S.C. § 1595(a). Here, L.H. maintains that the Defendants are liable because they knowingly benefitted from participation in a venture that they either knew or should have known violated § 1591(a) of the TVPRA. Section 1591, in turn, criminalizes the sex trafficking of, or knowingly assisting, supporting, or facilitating the sex trafficking of, (1) children or (2) adults by force, fraud, or coercion. 18 U.S.C. § 1591(a). L.H.'s beneficiary claim under the TVPRA "can be broken down into four component parts: that the [Defendants] (1) knowingly benefited (2) from participating in a venture; (3) that venture violated the TVPRA as to [L.H.]; and (4) the [Defendants] knew or should have known that the

venture violated the TVPRA as to [L.H.]." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021).

As set forth below, the issues in this case center on (A) whether the Court has general or personal jurisdiction over Hilton Worldwide; (B) whether L.H. has successfully stated a claim for relief under the TVPRA against the other Hotel Companies; and (C) whether L.H.'s allegations against craigslist can survive against the shield of § 230 immunity. Having reviewed the record, the parties' briefing, and the relevant legal authorities, the Court finds all three issues to be resolved in favor of the Defendants. Because the Court finds dismissal warranted on these bases, it declines to evaluate the Defendants' additional arguments.

### A. The Court does not have personal jurisdiction over Hilton Worldwide.

As an initial matter, Hilton Worldwide maintains that the Court lacks both general and specific personal jurisdiction over it. (Hilton & G6's Mot. at 28.) In opposition, L.H. insists the Court does have jurisdiction over Hilton Worldwide because "[t]his case arises out of Hilton-branded hotels located in Miami, Florida." (Pl.'s Resp. to the Hotel Cos. at 42.) Upon review, the Court finds L.H.'s position without support and agrees with Hilton Worldwide that the Court lacks jurisdiction over it.

First, general jurisdiction over a defendant only exists where the defendant has the kind of "continuous and systematic" contacts in a forum that would "render it essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (cleaned up). A defendant is generally considered "at home" only in its "place of incorporation and principal place of business." *Id.* at 137. Indeed, "[o]utside of these two exemplars, a defendant's operations will be so substantial and of such a nature as to render the corporation at home in that State only in an exceptional case." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1317 (11th Cir. 2018) (cleaned up).

L.H. has not established general jurisdiction over Hilton Worldwide. Hilton Worldwide is a Delaware corporation, with its principal place of business in Virginia. (Compl. ¶ 16.a.) And L.H. has supplied no facts, either in her complaint, by affidavit, or even by argument suggesting this is anything close to an "exceptional case" that would warrant treating Hilton Worldwide as at home in Florida. Without more then, here, the Court cannot claim general jurisdiction over Hilton Worldwide.

Next, to establish specific jurisdiction, a plaintiff "must show that the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered

there." *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025 (2021) (cleaned up). And, "even then—because the defendant is not 'at home'—the forum State may exercise jurisdiction . . . only" if "[t]he plaintiff's claims . . . arise out of or relate to the defendant's contacts with the forum." *Id.* (cleaned up).

      L.H. has also failed to establish specific jurisdiction over Hilton Worldwide. L.H.'s allegations fail to show that Hilton Worldwide has "reached out beyond" either Delaware or Virginia and exploited (or entered into contractual relationships in) the Florida market. *See id.* In contrast, Hilton Worldwide has supplied evidence, in the form of an affidavit from a senior vice president, that it is merely a holding company that manages and issues stock, conducting no substantive operating activities. (Wilcox Decl., ¶¶ 4–5, ECF No. 68-1, 2.) L.H.'s wholly conclusory claims that Hilton Worldwide "owns, supervises, manages, controls, and/or operates" four of the Miami Hotels (Compl. ¶¶16.d.–g.) cannot overcome Hilton Worldwide's showing, by affidavit, that, to the contrary, all substantive operations are performed by Hilton Worldwide's subsidiaries. (*See e.g.*, Wilcox Decl. ¶ 7 (Hilton Worldwide "does not manage any hotels"), ¶ 9 (Hilton Worldwide "is not a franchisor").)

      Further, to the extent L.H. seeks to impute the Florida contacts of other Hilton subsidiaries to Hilton Worldwide, her attempt is foreclosed by Eleventh Circuit precedent. As the Eleventh Circuit has explained, while apparent forum contacts from one actor can, in certain circumstances, certainly be imputed from another actor, for purposes of personal jurisdiction, such "jurisdictional veil piercing" or "alter ego" theories are "based on the rationale that when a defendant exerts a high degree of control over an entity, the contacts created by the entity are, in reality, created by the defendant." *United States ex rel. v. Mortgage Inv'rs Corp.*, 987 F.3d 1340, 1355 (11th Cir. 2021), *cert. denied sub nom. Mortgage Inv'rs Corp. v. United States ex rel. Bibby*, 141 S. Ct. 2632 (2021). This is why such imputation can only be justified where, for example, one entity "unilaterally controlled" another and "ignored corporate formalities." *Id.* at 1356. Here, however, L.H. has supplied no allegations supporting either a veil-piercing or alter-ego theory of personal jurisdiction: there are simply no facts here showing that corporate formalities were ignored; that Hilton Worldwide exerted extraordinary control over its subsidiaries; or that some unspecified other Hilton entity who manages or franchises any of the Miami Hotels is *really* Hilton Worldwide for the purposed of personal jurisdiction.

      All of L.H.'s arguments to the contrary fall wide of the mark. She provides zero support for her generalized argument that she "has alleged sufficient facts establishing [Hilton Worldwide's] ongoing and systemic right of control over its branded properties." (Pls.' Resp. to Hotel Cos. at 42.) Nor does her reliance on

Hilton Worldwide's professed commitment to providing training on human trafficking risks at all its hotels and its signing of the End Child Prostitution and Trafficking Code salvage her jurisdictional theories: neither allegation even mentions Florida or any of the Miami Hotels at issue in this case.

Finally, L.H.'s reliance on *J.C. v. Choice Hotels Int'l, Inc.*, a district court case from California, is misplaced. 20-CV-00155-WHO, 2020 WL 6318707 (N.D. Cal. Oct. 28, 2020). There, unlike here, the court pointedly found that the plaintiff had "sufficiently pleaded an agency relationship between the alleged brand hotels and the specific Hilton entity named here." *Id.* at *12. Additionally, the court there determined the allegations in the complaint were enough to establish that the same Hilton defendant owned, operated, and franchised hundreds of hotel properties in the forum state, including the hotels in which the plaintiff had been trafficked. Here, in contrast, the Court has not made such findings and, indeed, expressly concludes that L.H.'s allegations fall far short of those described by the California district court.

At bottom, Hilton Worldwide's presentation that it is nothing more than a holding company is uncontroverted and L.H.'s allegations fall far short of establishing the Court's personal jurisdiction over it.

### B. L.H. fails to state a claim for civil liability against the Hotel Companies under the TVPRA.

Much of the parties' quarrel as to the Hotel Companies' liability here revolves around the contours of the particular "venture" L.H. alleges, as relevant to the second, third, and fourth elements of her TVPRA claim: what exactly was the venture that the Hotel Companies took part in; how did that particular venture violate the TVPRA as to L.H.; and did the Hotel Companies know, or should they have known, that that venture violated the TVPRA as to L.H.

As recently explained by the Eleventh Circuit, "venture," as that term is used in § 1595(a), is defined as "a common undertaking or enterprise involving risk and potential profit." *Red Roof Inns*, 21 F.4th at 725. In briefing, L.H. argues that, in her complaint, she has sufficiently alleged the Hotel Companies' participation in "business ventures that strategically adopted hotel operating business models and [Hotel Company] standards which attract traffickers and maximize profit, while simultaneously choosing not to implement effective anti-trafficking measures." (Pl.'s Resp. to the Hotel Cos. at 20.) L.H. describes these ventures as both "collective business ventures," which were coordinated on an industry-wide basis, among the Hotel Companies, and, apparently, others, as well as local-business ventures, related to the control the Hotel Companies had over their respective Miami Hotels.

In response, in urging dismissal, the Hotel Companies identify various shortcomings in L.H.'s position. First, they point out, the "ventures" L.H. identifies in her *complaint* are sex-trafficking ventures, involving L.H.'s traffickers, and not the business ventures she now describes in *argument*. Second, the Hotel Companies submit L.H.'s complaint is devoid of any factual allegations that could plausibly establish either the collective, industry-wide ventures or the more localized ventures between the Hotel Companies and the Miami Hotels she describes in her briefing. Third, the Hotel Companies say, even if L.H. had sufficiently alleged either of these business ventures, she fails to allege facts showing that the ventures themselves committed a criminal violation of the TVPRA under § 1591(a). And fourth, the Hotel Companies continue, L.H. fails to present factual allegations showing that they had either actual or constructive knowledge that any of their purported business ventures violated the TVPRA specifically *as to L.H.* And, finally, apart from these direct-liability issues, the Hotel Companies also argue that, to the extent L.H. attempts to impose vicarious or indirect liability on the Hotel Companies, those allegations also fail. After careful review, the Court agrees with the Hotel Companies: as she has presented them, L.H.'s claims against the Hotel Companies all come up short.

As to the first issue, in response to the Hotel Companies' motions to dismiss, L.H. describes two different "business ventures," each of which she says qualify as the "common undertaking or enterprise involving risk and potential profit" that she must allege to establish her TVPRA claim: a "collective business venture" and a "local business venture." L.H. describes these ventures, generally, as "hotel operating business ventures that attracted sex traffickers to [the Hotel Companies'] hotels and maximized profits, while simultaneously choosing not to implement effective anti-trafficking measures." (Pl.'s Resp. to Hotel Cos. at 23.)

Within her complaint, however, L.H. never describes the venture at issue here as anything other than one specifically "engaging in sex trafficking" itself. For example, she says that the Defendants each "knowingly benefitted . . . from its participation in a venture . . . known to *engage in sex trafficking.*" (Compl. ¶ 13; *see also* ¶ 15.k. ("Marriott knowingly benefitted . . . from its participation in a venture . . . known to *engage in sex trafficking.*") (emphasis added); ¶ 15.m. ("Marriott . . . profited from an illegal *sex trafficking venture* at the Marriott Stanton Hotel.") (emphasis added); ¶ 16.n. ("Hilton knowingly benefited . . . from its participation in a venture . . . known to *engage in sex trafficking.*") (emphasis added); 16.p. ("Hilton . . . profited from an illegal *sex trafficking venture* at the Hilton Bentley Hotel, Hilton Miami Downtown, Hilton Garden Inn, and Hilton Embassy Suites.") (emphasis added); ¶ 17.g. ("G6 knowingly benefited . . . from its facilitation of or participation in a venture it knew or should have known had

engaged in *sex trafficking*.") (emphasis added). Even when describing the ventures in broad strokes, L.H. depicts the "Defendants, as an industry," as generating billions of dollars yearly "from *human trafficking ventures.*" *Id.* ¶ 82 (emphasis added). And when referring to the ventures on a more localized level, she frames various Miami Hotel staff members' engagement in the "ventures" in terms of their direct interactions with L.H.'s traffickers and complying with their "excessive requests for . . . clean linen and towels for the ones soiled with human bodily fluids." (*Id.* ¶¶ 146.e., 161.e, 175.e., 189.e., 203.e., 218.e.) Notably, not a single express reference to the relevant venture, within L.H.'s complaint, even hints at the business ventures she now describes in argument. (*E.g., id.* ¶ 219 ("Defendant Hotels profited from the sex trafficking of L.H. and knowingly or negligently aided and engaged with her trafficker in a *sex trafficking venture.*") (emphasis added); ¶ 222 ("Defendant Hotels profited from the sex trafficking of L.H. and knowingly or negligently aided and *participated with L.H.'s trafficker in his criminal venture.*") (emphasis); 233 (describing the venture as specifically violating § 1591(a)).)[3]

      Second, to the extent there are allegations in L.H.'s complaint that could be cobbled together and somehow read to implicate the business ventures she now points to as supporting her claims, not a single one of those allegations supplies *facts* from which the Court could infer any kind of *common* undertaking or enterprise, among the Hotel Companies themselves. Instead, every single allegation L.H. relies on, to support her new business-venture theory, is either inadequate, vague, speculative, or wholly conclusory. For example, in her complaint, she describes the Hotel Companies as "collectively" declining to implement various policies "that would likely have the effect of reducing the billions of dollars in sex trafficking profits." (Compl. ¶ 81; *see also* ¶ 12 (referring to the Hotel Companies' "collective failure to act" or introduce anti-trafficking measures); ¶ 62 (saying the "Defendants together" acted through a "unified commitment").) Or she refers, generally, to the Hotel Companies' "coordinated effort" to avoid implementing effective anti-trafficking policies and procedures (*id.* ¶ 82) and "coordinated efforts" to create the impression that the industry as a whole was taking steps to combat human trafficking while actually doing nothing (*id.* ¶ 83). (*See also* ¶ 74 (describing the Hotel Companies' "concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers away

---

[3] As L.H. herself acknowledges, the Eleventh Circuit's recent decision in *Red Roof Inns* forecloses L.H.'s ability to state a claim, based on the complaint's allegations, premised on the Defendants' participation in the sex-trafficking venture itself. (Pl.'s Resp. to Hotel Cos. at 23 n. 20 ("L.H. does not premise the [Hotel Companies'] direct liability under § 1595 on [their] participation in any joint sex trafficking venture with her trafficker.") (emphasis in original) (citing *Red Roof Inns.*, 21 F.4th 714) (pointing out, at 727, that "observing something is not the same as participating in it").)

from" the Hotel Companies themselves).) She also points to the Hotel Companies' "overall complacency" and their "general refusal to adopt and enforce company-wide anti-trafficking policies." (*Id.* ¶ 33.) She also uses purely conclusory words like "complicity" (*id.* ¶56) and frequently lumps all the Hotel Companies together when describing their roles in and enormous profits earned from L.H.'s trafficking (*e.g., id.* ¶¶ 11, 57, 59–60, 63, 73, 80, 84, 221–28). In short, L.H.'s allegations are long on unsupported and sweeping generalizations but short on actual, particularized facts. Indeed, not a single allegation supplies any facts from which the Court could infer that the Hotel Companies were ever engaged, with each other, in any kind of *common* undertaking or enterprise involving risk and potential profit.

And while L.H. might arguably have alleged a common undertaking or enterprise involving risk and potential profit as between each Hotel Company and their respectively associated Miami Hotels, L.H. fails to tie whatever that common undertaking or enterprise might be to any particular criminal violation of the TVPRA under § 1591(a). That is, to the extent L.H. may have alleged enough facts from which the Court could infer a series of business ventures between the Hotel Companies and their respective Miami Hotels, there is not a single factual allegation tying whatever those local business ventures might be to sex trafficking, even in general, and certainly not to the sex trafficking of L.H., in particular. This too dooms L.H.'s complaint—in order to survive dismissal, L.H. must plead sufficient facts to plausibly allege that the very venture in which the Hotel Companies participated actually committed the implicated TVPRA violation itself. *Red Roof Inns*, 21 F.4th at 725 ("[T]he [plaintiffs] must plead sufficient facts to plausibly allege that the venture in which the franchisors participated committed one of these crimes against them.").

In other words, some aspect of the venture, as defined by L.H., must have "knowingly" recruited or harbored (or committed some other listed act against) L.H., "knowing, or . . . in reckless disregard of the fact," that she was either a minor or that force, threats of force, fraud, or coercion, would be used against her, in order "to cause" her "to engage in a commercial sex act." 18 U.S.C. § 1591(a). At most, as L.H. in her response acknowledges, the complaint's allegations show that any local business venture simply *allowed* the trafficking by "fail[ing] to combat sex trafficking through ineffective policies, procedures, and training for the purpose of maximizing their profit." (Pl.'s Resp. to Hotel Cos. at 27.) But as several courts have recognized, this is not enough to trigger TVPRA liability, as "observing something is not the same as participating in it." *Red Roof Inns*, 21 F.4th at 727; *see also A.B. v. Wyndham Hotels & Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. 2021) ("[T]he TVPRA does not impose an affirmative duty to police and prevent sex trafficking."); *A.D., v. Wyndham Hotels*

*& Resorts, Inc.*, 4:19CV120, 2020 WL 8674205, at *3 (E.D. Va. July 22, 2020) ("[A] failure to affirmatively prevent or inhibit sex trafficking does not constitute participation."). Because the Court finds L.H. fails to allege the Hotel Companies' participation in a venture, amongst themselves, and fails to allege that any aspect of a local business venture she may have alleged violated the TVPRA as to L.H., the Court declines to evaluate whether L.H. has satisfied the fourth element, by showing that the Hotel Companies knew or should have known that the alleged venture violated the TVPRA as to L.H.

Finally, to the extent L.H. seeks to hold the Hotel Companies vicariously or indirectly liable, those claims also come up short. Throughout her complaint, L.H. refers to the agency or apparent-agency relationship between the Hotel Companies and their respective Miami Hotels. (*E.g.*, Compl. ¶ 15.e. ("Marriott is the principal in an agency relationship with the Marriott Stanton Hotel); ¶ 15.f. ("The Marriott Stanton Hotel where L.H. was trafficked has apparent agency for Marriott.").) However, her complaint presents no plausible or non-conclusory allegations that would, in fact, establish either a direct-agency or an apparent-agency relationship between any of the Hotel Companies and their respective Miami Hotels. As argued by the Hotel Companies, L.H., at most, has alleged the Hotel Companies' ability to maintain consistent brand standards without creating an agency relationship. (Hilton Cos. & G6 Mot. at 25.) In response, L.H. directs the Court's attention to nearly forty pages of her complaint, maintaining that within those dozens of pages she "has sufficiently [pleaded] that the [Hotel Companies] retained complete control, not just in some, but in all aspects of their hotel properties' operations, and are, therefore, liable for any acts and/or omissions that occurred on their branded properties." (Pl.'s Resp. to Hotel Cos. at 38.) L.H. misses the mark.

To begin with, gesturing vaguely to nearly forty pages of a complaint is an inadequate way to respond to the Hotel Companies' exacting and pointed argument. Secondly, upon scrutiny, the allegations L.H. points to are, in any event, unavailing. For example, in her complaint, L.H. submits that both Marriott International and Hilton Domestic "own[], supervise[], or operate[]" their respective Miami Hotels. (Compl. ¶¶ 86.a., 87.a.) But such conclusory allegations, especially as presented in the disjunctive, are far too vague and generalized to establish an agency relationship—either apparent or direct. Similarly, in alleging that each of the Hotel Companies "was in an agency relationship with" each of their respective Miami Hotels, L.H. points to a list of "one or more" actions each Hotel Company took in exercising daily business control. (Compl. ¶¶ 86.h., 87.h, 88.h.) But L.H.'s "use of the modifier 'one or more' strips these allegations of any force." *H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 708 (E.D. Mich. 2020). Based on this allegation, the Court has

no way of knowing which of the twenty actions L.H. says the Hotel Companies *may* have taken that they actually took. This renders these allegations "far too uncertain and vague" to plausibly establish an agency relationship between the Hotel Companies and any of the Miami Hotels. *Id.* Nor does L.H. link any of her allegations of agency, as conclusory as they are, to any control the Hotel Companies had over an instrumentality that actually caused the complained of harm to L.H. Indeed, regardless of whether the agency question is scrutinized under federal or state law, L.H.'s allegations are so deficient that she falls far short of plausibly stating vicarious liability under either standard.

      L.H.'s allegations specific to apparent agency fare no better. Under Florida law, "apparent agency, arises only when there has been (1) a representation by the principal that the actor is his or her agent, (2) reliance on that representation by a third party, and (3) a change in position by the third party in reliance on that representation." *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1253 (11th Cir. 2014) (quoting *Stalley v. Transitional Hosps. Corp. of Tampa, Inc.*, 44 So.3d 627, 630 (Fla. 2d DCA 2010). Other than her conclusory allegations that the Miami Hotels had apparent agency for the Hotel Companies (*e.g.*, Compl. ¶¶ 15.f., 16.i., 88.j.), L.H. also supplies a list of ways Marriott and Hilton purportedly "clothed" the Miami Hotels with apparent authority to act on their behalf: that Marriott and Hilton required their Miami Hotels to use Marriott and Hilton's signs; stationery; website and 1-800 numbers, for guest reservations; and guest-rewards programs. (*Id.* ¶¶ 86.j., 87.j.)

      In response to the Hotel Companies' motion to dismiss, arguing that these allegations are insufficient to establish apparent agency, L.H. points to a general expectation, based on the Hotel Companies' public statements committing to combatting trafficking, that the Hotel Companies would train and support their hotel properties. (Pl.'s Resp. Hotel Cos. at 40.) From there, she directs the Court's focus to L.H.'s traffickers "who relied on the willful blindness, inaction, lack of standards, lack of training, lack of awareness, and lack of reporting by the [Hotel Companies]" which enabled the traffickers' exploitation of L.H. (*Id.* at 41.) She then goes on to reiterate that the Hotel Companies had every opportunity to stop or prevent L.H.'s victimization but failed to do so. (*Id.*) Continuing, L.H. reasons that, as a direct and proximate result of the Hotel Companies' actions, or lack thereof, she was damaged. (*Id.*) None of those arguments, however, or the paragraphs she cites to in the complaint to support them, comes anywhere near establishing any of the elements required to show apparent agency. Regardless of whether the "third party" is considered to be L.H. or, as L.H. suggests, her traffickers, the mere facts that the Miami Hotels were required to use the Hotel Companies' signs, stationery, websites, 1-800 numbers, and guest-rewards programs are wholly insufficient to establish any

representation of agency or any reliance on that representation, as to the TVPRA violation, by either L.H. or her traffickers. In short, L.H. has not alleged facts sufficient to support the inference of apparent agency.

In sum, as set forth above, L.H.'s allegations fall short of stating a claim, either directly or indirectly, for TVPRA liability against the Hotel Companies.

### C. craigslist is entitled to immunity under § 230.

According to craigslist, L.H.'s TVPRA claim against it should be dismissed because, among other reasons, craigslist is shielded from liability by the Communications Decency Act, 47 U.S.C. § 230. In response, L.H. maintains craigslist is not immunized from liability under the CDA because (1) craigslist, having itself developed and created some of the trafficking content on its website, is responsible for it, at least in part; (2) craigslist cannot be shielded from its own misconduct; and (3) even if the Court found § 230 immunity applicable, the Fight Online Sex Trafficking Act withdrew that immunity for TVPRA claims involving sex trafficking.[4] (Pl.'s Resp. to Hotel Cos. at 9–19.) After careful review, the Court agrees with craigslist and finds L.H.'s arguments misplaced.

Section 230 of the Communications Decency Act immunizes interactive computer service providers, including websites like craigslist, from claims holding the website liable for third-party content posted on its internet platform. As set forth in § 230, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The statute thus "establish[es] *broad federal immunity* to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (cleaned up; emphasis added); see also *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("[Section 230] forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."); *Giordano v. Romeo*, 76 So. 3d 1100, 1102 (Fla. 3d DCA 2011) (explaining that "the law on this issue is clear": websites "enjoy[] complete immunity from any

---

[4] L.H. also maintains consideration of § 230 immunity is inappropriate at the motion-to-dismiss stage and is better left to a trier of fact. The Court is not persuaded. Courts in this circuit and elsewhere routinely grant dismissal on § 230 grounds, even where the plaintiff attempts to allege the defendant's material contribution to third-party content. *See Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014) (affirming a district court's § 230 dismissal and rejecting the plaintiff's argument that the defendant website contributed to the unlawfulness of the post at issue); *In re BitConnect Sec. Litig.*, 18-CV-80086, 2019 WL 9104318, at *13 (S.D. Fla. Aug. 23, 2019) (Middlebrooks, J.) (dismissing case with prejudice based on § 230 immunity); *see also Horne v. Potter*, 392 F. App'x. 800, 801 (11th Cir. 2010) (recognizing that a complaint may be dismissed for a failure to state a claim "when its allegations . . . show that an affirmative defense bars recovery on the claim").

action brought against [them] as a result of the postings of third party users"). In evaluating a defendant's entitlement to protection under § 230(c)(1), courts look to whether three elements are met: (1) the defendant is a provider of an interactive computer service, (2) the claim is based on information provided by another information content provider, and (3) the claim would treat the defendant as the publisher or speaker of that information. *Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1248 (S.D. Fla. 2020) (Singhal, J.).

As to her first argument, L.H. maintains that craigslist is not entitled to immunity because the second and third elements are not met.[5] L.H. says she seeks to hold craigslist liable for information craigslist itself has created or developed, at least in part, and not for simply publishing information provided by another. Her position primarily focuses on craigslist's creation of a section of its platform devoted to "erotic services," but also points to features like craigslist's embedded messaging system (which allows for confidential communications between buyers and sellers, along with the exchange of sexually explicit photographs) and its policy of accepting pre-paid credit cards for fees and burner phones for contact, which both help users maintain their anonymity. According to L.H., these features demonstrate that craigslist materially contributed to the advertisements L.H.'s traffickers posted of her on the platform. The Court is not convinced.

To begin with, a website does not "create" or "develop" content simply by providing tools that make user-created content available and usable to others. *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008)[6] ("[P]roviding neutral tools to carry out what may be unlawful or illicit searches does not amount to 'development' for purposes of the immunity exception.") (cleaned up). Instead, the term "development" is interpreted to refer "not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness." *Id.* at 1167–68. For example, a website will be found to have materially contributed to the unlawful nature of content where it pointedly solicited such content, essentially compelling users to engage in illegal conduct as a condition to using the platform. *Id.* at 1170, 72 (finding a roommate-matching website to fall outside the scope of § 230 immunity where it was "designed to solicit and enforce housing preferences that are alleged to be illegal" and which "forc[ed] subscribers to divulge protected characteristics and discriminatory preferences" as a condition of using the

---

[5] The parties do not dispute that craigslist is an interactive computer service, satisfying the first element.

[6] Both parties appear to agree that the Ninth Circuit's widely cited opinion in *Roommates* should guide the Court's analysis in this case. 521 F.3d 1157 (9th Cir. 2008). And, upon review, the Court finds the opinion persuasive and appreciates its utility as providing a framework here.

platform). By contrast, a website's supply of "neutral tools"—such as its "classifications" of user-created information—is not a material contribution because it does "nothing to enhance" the unlawfulness of the message. *Id.* Although such classifications "could be construed as 'development' under an unduly broad reading of the term," "such a broad reading would sap section 230 of all meaning." *Id.* (cleaned up). That is, where there has simply been "enhancement by implication or development by inference" by the website, "section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Id.* at 1174–75. Ultimately, to lose immunity, a website must have engaged in something more, having clearly and "directly participate[d] in developing the alleged illegality." *Id.* at 1174.

Here, "[n]othing in the service craigslist offers induces anyone to post any particular listing." *Id.* at 1172 n.33 (quoting *Chi. Lawyers' Comm. for C.R. Under L., Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008)). None of L.H.'s allegations amounts to a showing that craigslist materially contributed to the illegality of her traffickers' postings. While some of her allegations demonstrate craigslist's appalling lack of diligence in preventing trafficking, not a single one establishes that craigslist created or developed the trafficking content. For example, L.H. repeatedly describes craigslist's platform and policies as having "allowed" or even "encouraged" sex traffickers to market their victims by, among other things, requiring explicit images to be blurred or cropped and allowing the use of the aliases, but she fails to tie any of that conduct to the creation of the illegal posts themselves. Similarly, her allegations that craigslist "created" classified categories titled, for instance, "erotic services," "adult services," "casual encounters," or "massage services," fare no better. None of those categories, just by their existence, *required* or *induced* craigslist users to post unlawful content. Indeed, as L.H. herself acknowledges, craigslist's published policies affirmatively *prohibit* such content. (*E.g.*, Compl. ¶¶ 94, 104.) Put differently, L.H. appears to conflate, on the one hand, craigslist's creation of a platform that her traffickers *used* to traffic her, with, on the other, craigslist's having actually materially contributed, itself, to the creation and development of the illegal postings at issue. At bottom, nothing about the platform that craigslist provided, at least on L.H.'s allegations, led users to necessarily engage in the illegal trafficking conduct alleged here. While L.H. was certainly trafficked under craigslist's watch, that alone is insufficient to remove § 230's shield of liability.

In the same vein, L.H.'s protestation that she does not seek to hold craigslist liable as the "publisher or speaker" of the content generated by the traffickers also rings hollow. L.H. insists that she seeks to hold craigslist liable for its failure to prevent or, worse, its overt encouragement of, the generation of

the sex trafficking advertisements. But, to start, craigslist's failure to prevent or remove the postings is precisely the type of conduct Congress sought to immunize: seeking to hold craigslist liable for that failure is no different than attempting to treat craigslist as the publisher of the information in the postings, provided by the traffickers themselves. *See Roommates*, 521 F.3d at 1170–71 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.")

Next, the complaint does not provide any facts showing that craigslist actually "encouraged" the illegal trafficking posts. Instead, the factual allegations merely describe a system that *allowed* the illegal posts: for example, the creation of categories such as "erotic services" and "casual encounters" (*e.g.*, Compl. ¶¶ 91, 115); requiring a poster to designate a location (*e.g., id.* ¶ 95); allowing the use of aliases (*e.g., id.* ¶ 98); requiring explicit images to be blurred or cropped (*e.g., id.* ¶ 97); allowing the use of prepaid credit cards and burner phones; and providing for the use of an internal messaging system (*e.g., id.* ¶ 102). But L.H. has failed to supply facts showing that these aspects of craigslist's platform actually encourage illegal conduct any more than they, just as easily, allow for legal conduct.

Nor is the Court persuaded by L.H.'s related argument that craigslist cannot be immunized for its own misconduct. To begin with, that is the point of immunity: it provides an "exception from a . . . liability." IMMUNITY, Black's Law Dictionary (11th ed. 2019). Similarly, even though L.H. has certainly succeeded in alleging facts showing that craigslist's conduct is no doubt wrongful, that alone is not enough to remove § 230's cloak of immunity. *See BitConnect*, 2019 WL 9104318 at *13 ("While [the defendant] may have had a moral or ethical responsibility to protect its users from [various] allegedly fraudulent schemes, [the plaintiffs'] claim that it had a *legal* duty to do so is preempted by the CDA.") (emphasis in original). And, lastly, the Court finds the district court case from the Eastern District of Wisconsin that L.H. relies on, to support her position, unpersuasive and inapplicable here. (Pl.'s Resp. to craigslist at 14–15 (citing *Webber v. Armslist LLC*, 20-C-1526, 2021 WL 5206580 (E.D. Wis. Nov. 9, 2021).) There, the court appeared to find that the plaintiff had sufficiently alleged that the defendant, an online marketplace for arranging gun sales, had overtly facilitated illegal gun sales and specifically designed and built its website to not only allow and enable the transactions but also assisted, itself, in the illegal sales. *Webber*, 2021 WL 5206580 at *1. Indeed, the court there, unlike this Court, determined that the plaintiff plausibly sought to hold the website liable for its role in developing its own content. *Id.* *7. That is, in *Webber*, the court found the complaint focused on the website's own conduct and not, as here, on the illegal nature of the posts themselves. While L.H.'s complaint is rife with

conclusory and speculative allegations that craigslist's conduct went beyond simply reconveying another's information, L.H. supplies no actual facts from which the Court could infer as much. Without any viable allegations, then, showing that craigslist was not simply republishing the traffickers' information, or that craigslist was proactively creating and developing the illegal postings at issue here, L.H. cannot get past craigslist's immunity under § 230.

Finally, FOSTA does not withdraw craigslist's § 230 immunity here. L.H. argues that FOSTA withdrew immunity from all TVPRA claims involving sex trafficking, including the financial-beneficiary claim under Section 1595(a) pleaded in her complaint. (Pl.'s Resp. to craigslist at 17–19 (citing 47 U.S.C. § 230(e)(5)(A)).) In doing so, L.H. ignores the reasons why that cannot be correct, including (1) the plain language of the statutory provision; (2) consistency between the subparagraphs of Section 230(e)(5); (3) consistency with FOSTA's *parens patriae* provision, 18 U.S.C. § 1595(d); and (4) the legislative background revealing Congress's rejection of a more broadly worded exception.

These statutory and contextual indicators have led a conspicuous majority of courts to conclude that FOSTA withdrew immunity from only those § 1595 claims in which the defendant's conduct violated the TVPRA's criminal provision, 18 U.S.C. § 1591. *See, e.g., Kik*, 482 F. Supp. 3d at 1249 ("FOSTA removes CDA immunity only for claims 'under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title.'") (quoting 47 U.S.C. § 230(e)(5)(A)); *J. B. v. G6 Hosp., LLC*, 19-CV-07848-HSG, 2021 WL 4079207, at *5 (N.D. Cal. Sept. 8, 2021), *motion to certify appeal granted,* 19-CV-07848-HSG, 2021 WL 6621068 (N.D. Cal. Dec. 16, 2021) (reading FOSTA "to limit the scope of civil sex trafficking claims against interactive computer services that otherwise meet the requirements for CDA immunity to circumstances in which *the defendant's conduct amounts to a violation of section 1591*") (emphasis added).[7] L.H.'s attempt to distinguish *Kik* on its facts (Pl.'s Resp. to craigslist at 19) fails because this is purely a matter of statutory interpretation. Ultimately, because L.H. did not allege in her complaint that craigslist itself violated § 1591, the Court finds her claim does not fall within the FOSTA exemption and must be dismissed as barred by Section 230(c)(1).

---

[7] The two courts that reached the opposite conclusion did not fully address the contextual and legislative history arguments exhaustively considered in other cases. *See Doe v. Twitter, Inc.*, No. 21-cv-00485-JCS, 2021 WL 3675207, at *24–5 (N.D. Cal. Aug. 19, 2021) (failing to address statutory context and the legislative process that narrowed the provision that became § 230(e)(5)(A)); *Doe v. Mindgeek USA Inc.*, No. SACV 21-00338-CJC(ADSx), 2021 WL 5990195, at *8-9 (C.D. Cal. Dec. 2, 2021) (relying on FOSTA's "remedial purpose").

### 4. Conclusion

Undeniably, the facts L.H. sets forth in her complaint are horrific. That anyone would have to endure what L.H. says she has endured, all while large corporations profit from her brutalization, is beyond appalling. But, while L.H.'s allegations paint a grievous and sinister picture, where the Hotel Companies and craigslist certainly appear to have knowingly allowed and benefitted from her dehumanizing abuse, that horror alone does not trigger liability under the TVPRA. And without other legislation or some other viable cause of action, this is a wrong, under these particular allegations and against these particular defendants, that is beyond the Court's reach to right.

For the reasons set forth above, the Court **grants** the Defendants' motions to dismiss. (**ECF Nos. 46, 48, 68**.) The Court **dismisses** L.H.'s case against **Marriott International, Hilton Domestic, and G6 Hospitality**) **with prejudice**, for a failure to state a claim; against **Hilton Worldwide**, **without prejudice**, based on a lack of personal jurisdiction; and against **craigslist**, **with prejudice**, based on its immunity under § 230.  Further, the Court **denies** L.H.'s cursory requests for **leave to amend**, inserted as afterthoughts, in both her responses (Pl.'s Resp. to craigslist at 20; Pl.'s Resp. to Hotel Cos. at 15, 45): the requests are both procedurally defective and lacking in substantive support. *See Newton v. Duke Energy Florida, LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."); *Avena v. Imperial Salon & Spa, Inc.,* 740 F. App'x 679, 683 (11th Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.") (noting also that "a motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment") (cleaned up). Furthermore, L.H. has attempted to plead her case now, unsuccessfully, three times. (ECF Nos. 7, 13, 37.) And, finally, the deadline for amending the pleadings has also long since passed so L.H.'s requests are denied as untimely as well. (Sched. Order, ECF No. 64, 1.)

The Clerk is directed to **close** this case. Any other pending motions are **denied as moot**.

**Done and ordered** in Miami, Florida, on May 20, 2022.

_____
Robert N. Scola, Jr.
United States District Judge